ORAL ARGUMENT NOT YET SCHEDULED
Nos. 25-1187 & 25-1197

# In the United States Court of Appeals for the District of Columbia Circuit

————————

ALON REFINING KROTZ SPRINGS, INC.,
*Petitioner*,

v.

U.S. ENVIRONMENTAL PROTECTION AGENCY,
*Respondent.*

————————

HF SINCLAIR REFINING & MARKETING LLC AND
HF SINCLAIR PARCO REFINING LLC,
*Petitioners*,

v.

U.S. ENVIRONMENTAL PROTECTION AGENCY,
*Respondent.*

————————

On Petition for Review of a Final Decision of the
Environmental Protection Agency, 90 Fed. Reg. 41,829 (Aug. 27, 2025)

————————

## JOINT BRIEF FOR PETITIONERS

————————

| | |
|---|---|
| Allyson N. Ho | Daniel J. Feith |
|   *Counsel of Record* |   *Counsel of Record* |
| Stephen J. Hammer | Peter C. Whitfield |
| Robert W. Frey | Peter A. Bruland |
| GIBSON, DUNN & CRUTCHER LLP | Cody M. Akins |
| 2001 Ross Avenue, Suite 2100 | SIDLEY AUSTIN LLP |
| Dallas, TX 75201 | 1501 K Street, NW |
| (214) 698-3100 | Washington, DC 20005 |
| aho@gibsondunn.com | (202) 736-8000 |
| | dfeith@sidley.com |
| | |
| *Counsel for Petitioners* | *Counsel for Petitioner* |
| *in No. 25-1197* | *in No. 25-1187* |

(additional counsel listed on inside cover)

Christine M. Buzzard
Lavi M. Ben Dor
M. Christian Talley
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, NW
Washington, DC 20036
(202) 955-8500

*Counsel for Petitioners*
*in No. 25-1197*

### CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), petitioners hereby certify the following as to the parties, rulings, and related proceedings in this case:

**Parties and *Amici*.**  This case involves petitions for review filed directly in this Court.  Accordingly, the requirement of Circuit Rule 28(a)(1) to list the parties, intervenors, and *amici* that appeared below does not apply.  In this Court, petitioners are Alon Refining Krotz Springs, Inc., HF Sinclair Refining & Marketing LLC, and HF Sinclair Parco Refining LLC; respondent is the U.S. Environmental Protection Agency; movant-intervenors are Growth Energy, Renewable Fuels Association, Clean Fuels Alliance America, Coalition for Renewable Natural Gas, and Sustainable Advanced Biofuel Refiners Coalition; and counsel is unaware of any party that anticipates moving to participate as an *amicus curiae*.

**Rulings Under Review**.  The rulings under review are EPA's August 22, 2025 final decisions denying petitioners' applications for an exemption from their compliance obligations under the Clean Air Act's Renewable Fuel Standard for the 2024 compliance year.  EPA published

notice of its decisions in the Federal Register on August 27, 2025, at 90 Fed. Reg. 41829.

**Related Cases.**  The following cases involve challenges, on different grounds than those at issue here, to EPA's August 22, 2025 adjudication of other small-refinery-exemption applications: *REH Company, LLC v. EPA*, No. 25-1180 (D.C. Cir.), and the cases consolidated with it; *Alon USA, LP v. EPA*, No. 25-60584 (5th Cir.); *Suncor Energy (U.S.A.) Inc. v. EPA*, No. 25-9582 (10th Cir.); *Hunt Refining Company v. EPA*, No. 25-13759 (11th Cir.).  At this time, counsel is unaware of any other related cases within the meaning of Circuit Rule 28(a)(1)(C).

## RULE 26.1 DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rule 26.1, petitioners hereby state the following:

**Alon Refining Krotz Springs, Inc.** is a direct or indirect wholly owned subsidiary of Delek US Holdings, Inc. Delek US Holdings, Inc. is a publicly traded company. No publicly held company has a 10% or greater ownership interest in Delek US Holdings.

**HF Sinclair Refining & Marketing LLC** is a Delaware limited liability company that is a fuel supplier and marketer and has its principal place of business at 2323 Victory Avenue, Suite 1400, Dallas, Texas 75219. HF Sinclair Refining & Marketing LLC is a wholly owned subsidiary of HollyFrontier Corporation. HollyFrontier Corporation is a Delaware corporation that has its principal place of business at 2323 Victory Avenue, Suite 1400, Dallas, Texas 75219 and is a wholly owned subsidiary of HF Sinclair Corporation.

**HF Sinclair Parco Refining LLC** is a Delaware limited liability company that operates a refinery and has its principal place of business at 2323 Victory Avenue, Suite 1400, Dallas, Texas 75219. HF Sinclair Parco Refining LLC is a wholly owned subsidiary of Sinclair Oil LLC.

iii

Sinclair Oil LLC is a Delaware limited liability company that has its principal place of business at 2323 Victory Avenue, Suite 1400, Dallas, Texas 75219 and is a wholly owned subsidiary of Sinclair Holding LLC.  Sinclair Holding LLC is a Delaware limited liability company that has its principal place of business at 2323 Victory Avenue, Suite 1400, Dallas, Texas 75219 and is a wholly owned subsidiary of HF Sinclair Corporation.

HF Sinclair Corporation is a publicly traded company that has no parent company.  The publicly traded Blackrock, Inc., has a 10% or greater ownership interest in HF Sinclair Corporation.  HF Sinclair Corporation is a Delaware corporation and has its principal place of business at 2323 Victory Avenue, Suite 1400, Dallas, Texas 75219.

# TABLE OF CONTENTS

Certificate as to Parties, Rulings, and Related Cases ...............................i

Rule 26.1 Disclosure Statement................................................ iii

Table of Authorities ......................................................vii

Glossary ..............................................................xiii

Introduction ............................................................ 1

Jurisdictional Statement ...................................................5

Statement of the Issues ....................................................5

Statutes and Regulations ..................................................6

Statement of the Case .....................................................6

    A. The Renewable Fuel Standard ......................................6

    B. Small-Refinery Exemptions .......................................8

    C. The Challenged Actions ..........................................12

    D. Procedural History..............................................16

Summary of Argument....................................................18

Standing................................................................23

Standard of Review ......................................................23

Argument...............................................................24

   I. EPA wrongly determined that petitioners were ineligible for small-refinery exemptions. ...........................................24

    A. EPA's decisions violate the Clean Air Act. ...........................24

    B. EPA's decisions violate its own regulation. ...........................30

II. The Court has jurisdiction over petitioners' challenges to EPA's August 2025 exemption denials............................................36

    A. Petitioners seek review of EPA's 2025 denials—not its 2014 regulation. ...........................................................36

        1. These actions timely challenge EPA's 2025 denials. .......37

        2. EPA's authorities don't justify barring petitioners from challenging the 2025 denials....................................41

    B. After-arising grounds independently render the challenges timely. ........................................................45

        1. The refineries' increase in throughput in 2023 constitutes an after-arising factual development. ...........47

        2. EPA's misinterpretation of the regulation's plain language constitutes an after-arising legal development. ........................................................50

Conclusion....................................................................53

Certificate of Compliance ...................................................C-1

Certificate of Service ........................................................C-2

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ADX Commc'ns of Pensacola v. FCC,*
794 F.3d 74 (D.C. Cir. 2015) ................................................................ 23

*Alon Refin. Krotz Springs, Inc. v. EPA,*
936 F.3d 628 (D.C. Cir. 2019) ............................................................. 27

*Alvin Lou Media, Inc. v. FCC,*
571 F.3d 1 (D.C. Cir. 2009) ................................................................ 39

*Am. Lung Ass'n v. EPA,*
985 F.3d 914 (D.C. Cir. 2021) ........................................................ 46, 51

*Am. Rd. & Transp. Builders Ass'n v. EPA,*
554 F. App'x 18 (D.C. Cir. 2014) .................................................... 41, 42

*Am. Rd. & Transp. Builders Ass'n v. EPA,*
588 F.3d 1109 (D.C. Cir. 2009) ...................................................... 41, 42

*Am. Rd. & Transp. Builders Ass'n v. EPA,*
705 F.3d 453 (D.C. Cir. 2013) ........................................... 41, 42, 43, 49

*Balt. Gas & Elec. Co. v. ICC,*
672 F.2d 146 (D.C. Cir. 1982) ...................................................... 47, 48, 49

*Bennett v. Spear,*
520 U.S. 154 (1997) ............................................................................ 39

*Calumet Shreveport Refin., L.L.C. v. EPA,*
86 F.4th 1121 (5th Cir. 2023) ........................................................... 44

*Christopher v. SmithKline Beecham Corp.,*
567 U.S. 142 (2012) ...................................................................... 34, 35

*Chrysler Corp. v. EPA,*
600 F.2d 904 (D.C. Cir. 1979) ........................................................... 43

*Citizens for Resp. & Ethics in Wash. v. FEC,*
  971 F.3d 340 (D.C. Cir. 2020) .................................... 39, 40, 41

*Coal. for Responsible Regul., Inc. v. EPA,*
  684 F.3d 102 (D.C. Cir. 2012) ...................................... 45, 53

*Ctr. for Biological Diversity v. EPA,*
  141 F.4th 153 (D.C. Cir. 2025) .......................................... 45

*Functional Music, Inc. v. FCC,*
  274 F.2d 543 (D.C. Cir. 1958) ........................................... 40

*Gonzales v. Oregon,*
  546 U.S. 243 (2006) ...................................................... 34

*Graceba Total Commc'ns, Inc. v. FCC,*
  115 F.3d 1038 (D.C. Cir. 1997) .......................................... 39

*Hanson v. District of Columbia,*
  120 F.4th 223 (D.C. Cir. 2024) .......................................... 30

*HollyFrontier Cheyenne Refin., LLC v. Renewable Fuels Ass'n,*
  594 U.S. 382 (2021) ............................. 1, 8, 10, 11, 19, 23, 29

*Honeywell Int'l, Inc. v. EPA,*
  705 F.3d 470 (D.C. Cir. 2013) ........................................... 51

*Loper Bright Enters. v. Raimondo,*
  603 U.S. 369 (2024) ...................................................... 23

*McLaughlin Chiropractic Assocs., Inc. v. McKesson Corp.,*
  606 U.S. 146 (2025) ............................................ 42, 43, 44

*Med. Waste Inst. & Energy Recovery Council v. EPA,*
  645 F.3d 420 (D.C. Cir. 2011) ........................................... 44

*Mobley v. CIA,*
  806 F.3d 568 (D.C. Cir. 2015) ........................................... 23

*Nat'l Ass'n of Reversionary Prop. Owners v. Surface Transp. Bd.,*
  158 F.3d 135 (D.C. Cir. 1998) ........................................... 45

*Nat't Env't Dev. Association's Clean Air Proj. v. EPA,*
    752 F.3d 999 (D.C. Cir. 2014) ......................................................... 31, 35

*Nat'l Wildlife Fed'n v. EPA,*
    286 F.3d 554 (D.C. Cir. 2002) ............................................................... 33

*Newman v. FERC,*
    27 F.4th 690 (D.C. Cir. 2022) .................................................... 31, 33, 34

*Niz-Chavez v. Garland,*
    593 U.S. 155 (2021) ...................................................................... 25, 26

*Norfolk S. Ry. v. Surface Transp. Bd.,*
    72 F.4th 297 (D.C. Cir. 2023) ............................................................... 31

*NRDC, Inc. v. EPA,*
    824 F.2d 1146 (D.C. Cir. 1987) ............................................................. 38

*NB ex rel. Peacock v. District of Columbia,*
    794 F.3d 31 (D.C. Cir. 2015) ................................................................ 44

*Pub. Citizen v. NRC,*
    901 F.2d 147 (D.C. Cir. 1990) ........................................................ 39, 40

*Rumsfeld v. Padilla,*
    542 U.S. 426 (2004) ........................................................................... 25

*Russello v. United States,*
    464 U.S. 16 (1983) ............................................................................. 26

*Saint Francis Med. Ctr. v. Azar,*
    894 F.3d 290 (D.C. Cir. 2018) .............................................................. 34

*Sierra Club de P.R. v. EPA,*
    815 F.3d 22 (D.C. Cir. 2016) ......................................................... 45, 49

*Sierra Club v. EPA,*
    292 F.3d 895 (D.C. Cir. 2002) ........................................................ 22, 23

*Sinclair Wyo. Refin. Co. v. EPA,*
    114 F.4th 693 (D.C. Cir. 2024) ........................................... 1, 11, 12, 27

*Sinclair Wyo. Refin. Co. v. EPA,*
   887 F.3d 986 (10th Cir. 2017) ........................................................ 1, 10

*Trump v. Hawaii,*
   585 U.S. 667 (2018) .......................................................................... 26

*Wynnewood Refin. Co. v. EPA,*
   77 F.4th 767 (D.C. Cir. 2023) .......................................................... 28

*Zadvydas v. Davis,*
   533 U.S. 678 (2001) .......................................................................... 43

## Statutes and Regulations

5 U.S.C. § 706(2)(A) .................................................................... 23, 35

5 U.S.C. § 706(2)(C) ........................................................................ 23

42 U.S.C. § 7545(o)(1)(K) ........................................ 9, 13, 18, 25

42 U.S.C. § 7545(o)(2)(A) .................................................................. 6

42 U.S.C. § 7545(o)(2)(A)(i) ......................................................... 6, 27

42 U.S.C. § 7545(o)(2)(A)(iv) ............................................................ 26

42 U.S.C. § 7545(o)(2)(B)(i) ......................................................... 6, 27

42 U.S.C. § 7545(o)(2)(B)(ii) ........................................................ 6, 27

42 U.S.C. § 7545(o)(2)(B)(iii) ........................................................... 26

42 U.S.C. § 7545(o)(2)(B)(v) ............................................................. 26

42 U.S.C. § 7545(o)(3)(A) .................................................................. 7

42 U.S.C. § 7545(o)(3)(B) .................................................................. 28

42 U.S.C. § 7545(o)(3)(B)(i) ............................................................... 6

42 U.S.C. § 7545(o)(3)(B)(ii) .............................................................. 7

42 U.S.C. § 7545(o)(5) ....................................................................... 7

42 U.S.C. § 7545(o)(5)(C) ................................................................ 28

42 U.S.C. § 7545(o)(5)(D) ................................................................. 8

42 U.S.C. § 7545(o)(7)(A) ................................................................ 28

42 U.S.C. § 7545(o)(7)(C) ................................................................ 28

42 U.S.C. § 7545(o)(7)(F) ................................................................ 26

42 U.S.C. § 7545(o)(9) ................................................................ 1, 9

42 U.S.C. § 7545(o)(9)(A)(i) .............................................................. 9

42 U.S.C. § 7545(o)(9)(A)(ii)(II) ......................................................... 9

42 U.S.C. § 7545(o)(9)(B) ............................................................. 5, 24

42 U.S.C. § 7545(o)(9)(B)(i) ...................................................... 9, 11, 18

42 U.S.C. § 7545(o)(9)(K) ................................................................. 1

42 U.S.C. § 7607(b)(1) ................................. 5, 12, 18, 21, 36, 37, 40, 43, 45

42 U.S.C. § 7607(b)(2) ................................................................... 43

40 C.F.R. § 80.1407 ....................................................................... 7

40 C.F.R. §§ 80.1425–.1429 ............................................................... 7

40 C.F.R. § 80.1426(a) ................................................................... 7

40 C.F.R. § 80.1427 ....................................................................... 7

40 C.F.R. § 80.1427(a) ................................................................... 8

40 C.F.R. § 80.1427(a)(6) ................................................................ 8

40 C.F.R. § 80.1428(c) .................................................................. 17

40 C.F.R. § 80.1429(b) ................................................................... 7

40 C.F.R. § 80.1441(e)(2)(iii) ........... 3, 5, 13, 19, 30, 31, 32, 34, 35, 50, 52

40 C.F.R. § 80.1451(a)(1) ................................................................ 8

40 C.F.R. § 80.1451(f)(1)(i)(A)(1) ................................................. 17

40 C.F.R. § 80.2................................................................................ 13

79 Fed. Reg. 42,128 (July 18, 2014) ................................... 14, 33

**Rule**

D.C. Cir. R. 28(a)(7) .................................................................... 22

**Other Authorites**

Bryan A. Garner, *Modern English Usage* (5th ed. 2022) ....................... 25

EPA, *Letter from Andrew Wheeler, EPA Administrator, to Small Refineries* (Sept. 14, 2020), tinyurl.com/yccjnexs .................. 14, 35, 50

# GLOSSARY

| | |
|---|---|
| EPA | Environmental Protection Agency |
| RINs | Renewable Identification Numbers |

# INTRODUCTION

On three separate occasions over the past decade, the Supreme Court, this Court, and another court of appeals have struck down EPA's efforts to impose stricter eligibility conditions than the Clean Air Act allows on the hardship exemption for small refineries under the Renewable Fuel Standard. *See HollyFrontier Cheyenne Refin., LLC v. Renewable Fuels Ass'n*, 594 U.S. 382, 386 (2021); *Sinclair Wyo. Refin. Co. v. EPA*, 114 F.4th 693, 704–05 (D.C. Cir. 2024) (per curiam); *Sinclair Wyo. Refin. Co. v. EPA*, 887 F.3d 986, 994–95 (10th Cir. 2017). This case involves yet another attempt by EPA to unlawfully narrow the small-refinery hardship exemption—this time in violation of not only the Clean Air Act but also EPA's own regulation.

Under the Clean Air Act, exemptions from costly Renewable Fuel Standard compliance obligations are available to certain "small" refineries. 42 U.S.C. § 7545(o)(9). The Act defines a refinery as "small" if its crude oil throughput falls below a certain threshold for "**a** calendar year." § 7545(o)(1)(K) (emphasis added). Petitioners operate or market refineries that, in 2024, met the Act's definition of a "small refinery." So, in 2025, petitioners applied for exemptions from their 2024 compliance

1

obligations.  But EPA deemed them ineligible for 2024 exemptions and denied their applications.  It did so not because their throughput in **2024** was too large to qualify them as "small," but because their throughput in **2023** was—in essence reading "**a** calendar year" to mean **two** calendar years.  EPA defended its atextual reading by pointing to a regulation that, according to EPA, requires a refinery to be below the throughput threshold for two consecutive years—both the year of the requested exemption and the prior year.

EPA's denial of petitioners' petitions, however, violates both the Clean Air Act and EPA's own regulation.  Under the Act, "**a** calendar year" means one year, not two.  What the statute's plain text makes obvious, its context, structure, and other indicia confirm.  The term "calendar year" is singular; the article "a" applies to singular nouns; the Act repeatedly uses "calendar year" to refer to a single year; where the Act refers to multiple years, it does so explicitly; the overall Renewable Fuel Standard program proceeds on an annual cadence; and the Supreme Court has understood exemption eligibility to turn on throughput in one year, not two.  So when EPA decided that the refineries here aren't

2

"small" because their throughput didn't fall below the threshold for two consecutive years, EPA violated the statute.

EPA's denials independently violated the agency's own regulation. Contrary to EPA's gloss, the regulation does *not* require a refinery to be "small" in both the year of the requested exemption and the prior year. Rather, it says that to be eligible for an exemption, a refinery must be below the throughput threshold in (1) "the most recent full calendar year prior to seeking an extension" and (2) the year "for which an exemption is sought." 40 C.F.R. § 80.1441(e)(2)(iii). Petitioners sought exemptions in 2025 for the 2024 compliance year. So both the "most recent full calendar year prior to seeking an extension" and the year "for which an exemption is sought" were 2024. And it's undisputed that petitioners' refineries were below the throughput threshold in that year. Even under EPA's regulation, then, petitioners were eligible for an exemption.

Facing these obvious flaws in its reasoning, EPA hopes to escape judicial review with a jurisdictional smokescreen. But EPA can't dispute—indeed, it concedes—that this Court has jurisdiction to review petitioners' argument that the 2025 decisions deeming petitioners ineligible for an exemption violated EPA's regulation. It insists only that

petitioners' other challenge—concerning the 2025 denials' violation of the Clean Air Act—is time-barred. EPA posits that it may forever deny small-refinery relief based on an obvious misreading of the statute because the limitations period for directly challenging its regulation has expired.

That's not how judicial review of agency action works. EPA's 2025 denials constitute new agency actions with their own effects on petitioners—separate and apart from the 2014 regulation. Petitioners have timely sought review of those new agency actions and seek relief only as to those actions, not the 2014 regulation. The Court need not even read EPA's regulation to hold that EPA's 2025 denials were unlawful. Nor does the Court need to assess the regulation's lawfulness to decide that EPA strayed from that regulation in 2025. Even if these petitions could be construed as challenges to the 2014 rule, petitioners' challenges would still be timely because they rest on two grounds that first arose long after EPA promulgated the regulation: an increase in petitioners' crude oil throughputs, and EPA's misinterpretation of the regulation's plain language. The petitions are timely, and the Court has jurisdiction to review (and vacate) EPA's serious errors.

4

## JURISDICTIONAL STATEMENT

EPA had jurisdiction to resolve petitioners' exemption petitions under 42 U.S.C. § 7545(o)(9)(B).  EPA published notice of its final decisions denying petitioners' exemption petitions in the Federal Register on August 27, 2025.  JA040.  Petitioners timely petitioned for review from those decisions on September 16, 2025 (in No. 25-1187) and September 30, 2025 (in No. 25-1197).  *See* Doc. 2135532; Doc. 2138029.  This Court has jurisdiction under 42 U.S.C. § 7607(b)(1).  *See infra* Part II.

## STATEMENT OF THE ISSUES

**1.** Whether EPA violated the Clean Air Act by concluding that petitioners were ineligible for small-refinery exemptions because they didn't meet the definition of "small refinery" for ***two*** calendar years, when the statute makes exemptions available to a "small refinery" and defines that term based on a refinery's throughput in "***a*** calendar year."

**2.** Whether EPA violated its own eligibility regulation, 40 C.F.R. § 80.1441(e)(2)(iii), by deeming petitioners ineligible for an exemption even though petitioners met the definition of "small refinery" in both "the most recent full calendar year prior to seeking an extension" and "the year … for which an exemption is sought," and therefore satisfied both of the regulation's eligibility conditions.

5

**3.** Whether petitioners' challenges to EPA's final actions denying their petitions for small-refinery exemptions are timely because petitioners sought review of those actions within 60 days of the publication of notice in the Federal Register.

## STATUTES AND REGULATIONS

Pertinent statutes and regulations are set forth in the Addendum.

## STATEMENT OF THE CASE

### A.    The Renewable Fuel Standard

**1.** The Renewable Fuel Standard requires that certain volumes of biofuels be blended into transportation fuel sold in the United States. *See* 42 U.S.C. § 7545(o)(2)(A).  In the program's initial years, Congress prescribed steadily increasing annual volumes.  § 7545(o)(2)(B)(i).  In later years, Congress directed EPA to set the annual volume requirements. § 7545(o)(2)(B)(ii).  No matter who sets the requirements, EPA must "ensure" by regulation that domestic transportation fuels "contai[n] the applicable volume of renewable fuel" "on an annual average basis." § 7545(o)(2)(A)(i).

To implement the annual mandates, EPA sets for each biofuel category a yearly "renewable fuel obligation."  § 7545(o)(3)(B)(i).  This obligation is expressed as a percentage of all transportation fuel that the

6

Department of Energy predicts will be sold or introduced into domestic commerce in a given year. § 7545(o)(3)(A), (B)(ii). For example, if the projected amount of transportation fuel for 2026 were 100 billion gallons, and if EPA required introduction of 10 billion gallons of renewable fuel that year, then the 2026 renewable fuel obligation would be 10%. Refineries in turn calculate their individual annual renewable fuel obligations by multiplying EPA's annual volume percentage by the volume of transportation fuel that they produce or import that year. 40 C.F.R. § 80.1407.

**2.** Refineries demonstrate annual compliance with their Renewable Fuel Standard obligations by "retiring"—*i.e.*, submitting to EPA—a sufficient number of credits called "Renewable Identification Numbers" or "RINs." § 7545(o)(5); 40 C.F.R. § 80.1427. A RIN is created when a qualifying gallon of biofuel (*e.g.*, ethanol) is manufactured or imported. 40 C.F.R. § 80.1426(a).

The RIN remains attached to the physical volume of biofuel until it is "separated" by blending the biofuel into petroleum-based transportation fuel. *Id.* § 80.1429(b). The refinery that separates a RIN may keep it to demonstrate compliance or sell it to another refinery. *See id.* §§ 80.1425–80.1429. "Any given refinery may therefore comply with the

law thanks to its own blending efforts, the purchase of credits from some-one else, or a combination of both." *HollyFrontier*, 594 U.S. at 386.

Like the Renewable Fuel Standard obligations themselves, this compliance system follows an annual cadence. By regulation, EPA requires refineries to retire RINs for compliance each year. 40 C.F.R. §§ 80.1427(a), 80.1451(a)(1). A RIN may be used to demonstrate compliance only for the calendar year in which it was generated or the following calendar year. *Id.* § 80.1427(a)(6). If a refinery is unable to generate or purchase enough RINs to comply in a given year, it may carry forward a deficit if it both achieves compliance and makes up for the deficit in the "calendar year following the year in which the … deficit is created." § 7545(o)(5)(D).

### B.    Small-Refinery Exemptions

**1.** "Congress was concerned" that Renewable Fuel Standard obligations "could work special burdens on small refineries that lack the inherent scale advantages of large refineries and sometimes supply a major source of jobs in rural communities." *HollyFrontier*, 594 U.S. at 386–87 (cleaned up). To protect these refineries from the potentially crushing regulatory burden, Congress provided a series of exemptions from

Renewable Fuel Standard obligations for "small refineries." *See* § 7545(o)(9). A small refinery is "a refinery for which the average aggregate daily crude oil throughput for a calendar year (as determined by dividing the aggregate throughput for the calendar year by the number of days in the calendar year) does not exceed 75,000 barrels." § 7545(o)(1)(K).

Congress provided small-refinery exemptions in three phases. First, it gave all small refineries a blanket exemption from the Renewable Fuel Standard until 2011. § 7545(o)(9)(A)(i). Second, it instructed EPA to extend that exemption for at least two more years for any refinery that the Department of Energy found would "be subject to a disproportionate economic hardship if required to comply" with the Renewable Fuel Standard. § 7545(o)(9)(A)(ii)(II). Third, and most relevant here, Congress authorized a refinery to "at any time petition [EPA] for an extension of the exemption" if it qualifies as a "small refinery" and faces "disproportionate economic hardship." § 7545(o)(9)(B)(i).

This third category of petition-based exemptions reflects Congress's understanding "that small refineries might apply for exemptions in different years in light of market fluctuations and changing hardship

conditions." *HollyFrontier*, 594 U.S. at 393. By permitting a small refinery to petition for an exemption "at any time," Congress recognized that a refinery's need—and, by extension, eligibility—for relief may vary year to year. That language also recognized that, because many of the compliance challenges small refineries face are structural, their need for relief may not sunset. *See id.* at 395.

**2.** In EPA's view, the exemptions "are best understood as providing" a mere "bridge to compliance" that should "funnel small refineries toward compliance over time." U.S. Br. 28, *HollyFrontier Cheyenne Refin., LLC v. Renewable Fuels Ass'n*, No. 20-472 (U.S.) (cleaned up). But over the past decade, courts on at least three occasions have rejected EPA's view of the statutory criteria for hardship exemptions.

First, in 2016, EPA announced that it would not find that a refinery faced "disproportionate economic hardship" unless Renewable Fuel Standard compliance "threatened the 'long-term' survival of the refinery." *Sinclair Wyo.*, 887 F.3d at 994–95. The Tenth Circuit rejected that high bar as inconsistent with the Act's more modest hardship requirement. *Id.*

10

Second, a few years later, EPA took the position that a small refinery was ineligible for an "extension" of its exemption unless it had been continuously exempt in every prior year.  U.S. Br. 13, *HollyFrontier*, *supra*.  Nevermind that the statute permits a small refinery to apply for an exemption extension "at any time."  § 7545(o)(9)(B)(i).  The Supreme Court held that EPA's newfound "taper[] down" view of the exemption violated the statutory text.  *HollyFrontier*, 594 U.S. at 399 (citation omitted).

Third, in 2022, EPA interpreted the Act to prohibit it from considering any factor in assessing disproportionate economic hardship other than the costs of RINs bought contemporaneously with a refinery's sale of fuel, and it adopted the economic theory that every small refinery in every market could always perfectly pass through those costs to consumers, such that the cost of compliance was zero.  *Sinclair Wyo.*, 114 F.4th at 704–05.  The result: "No small refinery" would *ever* "experience[] disproportionate economic hardship as a result of compliance with the [Renewable Fuel Standard] program."  *Id.* at 705 (cleaned up).

This Court rejected that argument, holding that EPA's attempt to "render the exemption[] superfluous" conflicted with the statutory text

11

and rested on an arbitrary and capricious misunderstanding of the RIN market. *Id.* at 711.

### C. The Challenged Actions

This case again asks whether EPA has unlawfully narrowed the criteria for the small-refinery exemption.

In May 2025, petitioners Krotz Springs and HF Sinclair Refining & Marketing LLC and HF Sinclair Parco Refining LLC (collectively, "Parco") each applied to EPA for an exemption from their Renewable Fuel Standard obligations for the 2024 compliance year. SJA-AK3; SJA-HFS1. Petitioners' respective applications stated that their average throughput in 2024 was below the 75,000 barrel per day threshold, and that they each therefore qualified as a "small refinery" under the Clean Air Act. SJA-AK5; SJA-HFS12.

The Krotz Springs refinery didn't seek an exemption for the 2023 compliance year, when its output exceeded the eligibility threshold. *See*

SJA-AK39.  The Parco refinery didn't do so before the August 2025 denial decisions either.[1]

After petitioners submitted their exemption petitions, EPA told petitioners via email that their eligibility for an exemption in 2024 depended in part on whether they exceeded the throughput threshold in 2023.  SJA-AK35; SJA-HFS21.  EPA didn't cite either the Renewable Fuel Standard statute or its definition of a "small refinery."  *See* SJA-AK35; SJA-HFS21.  Instead, the agency pointed to 40 C.F.R. § 80.1441(e)(2)(iii), which, according to EPA, requires being below the throughput threshold during both the year for which an exemption is sought and the preceding year.  *See* SJA-AK35; SJA-HFS21.

That regulation provides:

> In order to qualify for an extension of its small refinery exemption, a refinery must meet the definition of "small refinery" in [40 C.F.R.] § 80.2 for the ***most recent full calendar year*** prior to seeking an extension and must be projected to

---

[1] After the August 2025 denial decisions, Parco filed with EPA a petition seeking a 2023 exemption demonstrating that its throughput in 2023 actually didn't exceed the 75,000-barrel-a-day threshold.  Doc. 2139286 at 2 n.1.  That petition, which is currently pending before EPA, isn't relevant for purposes of this case.  *See* 42 U.S.C. § 7607(b)(1) ("The filing of a petition for reconsideration by the Administrator of any otherwise final rule or action shall not affect the finality of such rule or action for purposes of judicial review ….").

meet the definition of "small refinery" in [40 C.F.R.] § 80.2 ***for the year or years for which an exemption is sought***.

40 C.F.R. § 80.1441(e)(2)(iii) (emphases added); *see id.* § 80.2 (defining "small refinery" in identical terms to the statutory definition in § 7545(o)(1)(K)).

EPA adopted that rule in 2014. 79 Fed. Reg. 42128, 42152 (July 18, 2014). Before then, any refinery that had been below the throughput threshold in 2006 qualified as "small." *Id.* Recognizing the potential for refinery growth and the need to ensure that "only truly small facilities" received hardship relief, *see* 79 Fed. Reg. at 42152, EPA amended its exemption eligibility criteria to focus on throughput "during the desired exemption period and the year immediately preceding the petition," EPA, *Letter from Andrew Wheeler, EPA Administrator, to Small Refineries* 2 (Sep. 14, 2020), tinyurl.com/yccjnexs; *see also* 79 Fed. Reg. at 42152 ("year prior to seeking an extension" means "year prior to an application for hardship").

The Krotz Springs and Parco refineries responded to EPA's emails with letters explaining that EPA's position was contrary to the statute and inconsistent with EPA's own regulation. SJA-AK37; *see also* SJA-HFS24.

Three months later, in August 2025, EPA adjudicated 175 small-refinery-exemption petitions, including Krotz Springs' and Parco's. JA012. EPA formally denied Krotz Springs' and Parco's 2024 applications, deeming them ineligible to petition for a *2024* exemption because their crude oil throughput exceeded 75,000 barrels per day *in 2023*. SJA-AK69; SJA-HFS34. EPA defended this two-year eligibility requirement on the ground that "[t]he statutory definition of small refinery does not include a specific year." JA018. EPA didn't explain how any statutory ambiguity as to *which* "calendar year" matters justified requiring *two* calendar years of below-threshold throughput. *See* JA017–19.

Nor did EPA explain how extending "a calendar" year of small-refinery status to two years was consistent with its interpretation of another aspect of the exemption scheme: the exemption's duration. Elsewhere in the August decision document, EPA justified limiting the duration of exemptions to a single year by pointing out that the statute uses the articles "a" and "an" to signify that the petitions and EPA's evaluation of them are "individual acts"; "creates new RFS obligations for a refinery on an annual basis"; and employs "specific duration" language where

15

Congress wanted to set "longer timeframe[s]." JA028–29 & n.101. EPA didn't extend this reasoning to the phrase "a calendar year."

EPA rejected petitioners' argument that it was misreading its own regulation, reiterating its view that the regulation "requires a qualifying small refinery to have a crude oil throughput of less than 75,000 [barrels per day] for two consecutive years." JA019.

## D. Procedural History

Krotz Springs and Parco each petitioned for review from EPA's denial of their exemption petitions in this Court in September 2025. *See* Doc. 2135532 (Krotz Springs); Doc. 2138029 (Parco). Although these two actions were initially consolidated with the other cases in this Court challenging EPA's August 2025 decisions, *see* No. 25-1180, petitioners asked the Court to sever their cases from the rest, consolidate them with each other, and set them for expedited briefing and consideration. *See* Doc. 2137090 (Krotz Springs); Doc. 2139286 (Parco); *see also* Doc. 2142374 at 4 n.1 (Krotz Springs joining Parco's request for consolidation).

Petitioners explained that expedition was necessary to prevent irreparable injury to petitioners and preserve their ability to obtain meaningful relief. Doc. 2137090 at 8–10; Doc. 2139286 at 9–11. If petitioners

16

prevail in this Court and then secure exemptions from EPA on remand, the relief they receive under EPA's current practice will consist of returned RINs petitioners used to satisfy their 2024 obligations.  JA031.

But with one exception not relevant here, a RIN is valid for compliance "during the calendar year in which it was generated, or the following calendar year," after which point it becomes "expired" and "cannot be used for compliance purposes."  40 C.F.R. § 80.1428(c).  That means any 2024 RINs returned to petitioners on remand can be used only for 2024 or 2025 compliance obligations—and the last day to use them could be as soon as March 31, 2026.  *Id.* § 80.1451(f)(1)(i)(A)(1).[2]  The upshot, petitioners explained, is that this Court's decision must come in time for EPA to conduct its exemption analysis on remand and for petitioners to receive any 2024 RINs to which they are entitled before the March 31 expiration date.  Doc. 2142374 at 20–23.

---

[2] The deadline to satisfy 2024 compliance-year obligations was December 1, 2025.  JA031 n.108.  The deadline for 2025 obligations will fall on the later of March 31, 2026, or the next quarterly reporting deadline after EPA issues its final rule setting the 2026 Renewable Fuel Standard obligations.  40 C.F.R. § 80.1451(f)(1)(i)(A).  But EPA hasn't disclaimed a March 31 deadline, suggesting only that it "*may*" be later depending on when EPA chooses to issue the rule.  Doc. 2140636 at 16 (emphasis added).

17

EPA opposed petitioners' motions and simultaneously moved to dismiss for lack of jurisdiction, arguing that petitioners are actually challenging the 2014 regulation EPA cited to deny their exemption petitions and that any such challenges could only have been brought within 60 days of that regulation's issuance. Doc. 2140636; Doc. 2140652. Petitioners responded that these actions are timely because they challenge EPA's 2025 denials of their petitions for exemptions—not the 2014 regulation—and because, even if construed as challenges to the rule, they are based on "grounds arising after" the deadline. Doc. 2142374 at 13; 42 U.S.C. § 7607(b)(1).

This Court in November 2025 granted petitioners' motions to sever, consolidate, and expedite these two actions. Doc. 2146228. It also referred EPA's motions to dismiss to the merits panel. *Id.* at 2.

## SUMMARY OF ARGUMENT

The Court should vacate EPA's decisions and remand for consideration of the merits of the refineries' exemption petitions.

**I.** EPA wrongly deemed the refineries ineligible for 2024 small-refinery exemptions.

**A.** EPA's two-year eligibility rule is contrary to law.  The plain text of the Clean Air Act makes exemptions available to certain "small refiner[ies]" and pegs "small refinery" status to a refinery's throughput for "a calendar year."  42 U.S.C. § 7545(o)(1)(K), (9)(B)(i).  The singular "year," combined with the singular article "a," shows that "a calendar year" means one calendar year.  Other uses of "calendar year" in the statute confirm that conclusion.  Congress consistently used "calendar year" to refer to one year, while using different language (*e.g.*, "2 consecutive years") to refer to longer periods.  Reading "a calendar year" as singular also fits naturally with the broader structure of the Renewable Fuel Standard program, which generally sets obligations on an annual cadence.

Precedent, too, supports giving "a calendar year" its plain meaning.  In *HollyFrontier*, the Supreme Court stated that refineries could lose small refinery status based on increased production in one year, then "mov[e] back into small refinery status" the next year when "production capacity falls."  594 U.S. at 393–94.  The Court understood "a calendar year" to mean precisely what it says.

19

**B.** Independent of its violation of the Clean Air Act, EPA's eligibility decision also violated the plain text of EPA's own regulation.  Under 40 C.F.R. § 80.1441(e)(2)(iii), a refinery is eligible for a "small refinery" exemption if it was below the throughput threshold for both "the most recent full calendar year prior to seeking an extension" and "the year or years for which an exemption is sought."  The former refers to the calendar year before the refinery applies for an exemption, and the latter to the compliance year for which the refinery seeks relief.  For petitioners, both the year before they applied and the year for which they sought relief is 2024, when they were undisputedly below the volume threshold.  So, they were eligible for a 2024 compliance year exemption even under EPA's own rule.

EPA cannot escape the rule's plain text by pointing to preamble statements or prior practice.  The text of the codified rule is clear, so there's no basis for deferring to EPA's uncodified interpretations of its rule.  In any event, the preamble to EPA's rule is internally inconsistent, and EPA has rarely, if ever, applied the rule the way it did here.  So neither preamble nor prior practice justifies departing from plain text.

20

**II.** EPA's argument that this Court lacks jurisdiction over petitioners' challenges fails.  EPA correctly "concedes that the Court may have jurisdiction to consider" petitioners' argument that the 2025 denials of petitioners' exemption requests misapplied the 2014 regulation—an argument that independently warrants vacatur.  Doc. 2143553.  EPA only disputes the timeliness of petitioners' other argument that the 2025 denials violate the Clean Air Act, but that argument, too, is timely.  The petitions challenge EPA's 2025 exemption denials.  They don't target the 2014 regulation itself.  But even if they did, petitioners' challenges are based on after-arising grounds that render them timely.

**A.** Petitioners challenge EPA's 2025 decisions to deny them small-refinery exemptions.  Because petitioners sought review of those decisions within 60 days of publication of notice in the Federal Register, this Court has jurisdiction.  42 U.S.C. § 7607(b)(1).  The fact that EPA purported to apply its 2014 regulation in the 2025 denials doesn't change anything because the denials are independent final agency actions from which petitioners have timely sought relief.

EPA is wrong to argue that the petitions are untimely backdoor challenges to the regulation.  Under longstanding principles of

21

administrative law, when an agency applies a regulation to a party in a new action, that party can challenge the application of the regulation to it and in so doing contest the regulation's substantive validity. Any other rule would allow agencies to continue applying unlawful regulations against regulated entities in perpetuity just because the regulations weren't challenged immediately after their issuance. That is not the law.

**B.** Even if the petitions were construed as challenges to the 2014 regulation, they would still be timely because the Clean Air Act restarts the clock for judicial review when factual or legal changes ripen a challenge that couldn't have been brought during the initial window for review. Both factual and legal changes ripened petitioners' claims here. On the facts, petitioners couldn't have challenged the 2014 regulation until EPA's 2025 denials because that was the first time EPA's multi-year requirement affected whether they qualified as small refineries. On the law, EPA's 2025 denials were also the first time EPA conclusively revealed that it would apply an atextual understanding of the regulation to deny petitioners' hardship petitions. Each development constitutes after-arising grounds that rendered petitioners' challenges timely.

22

## STANDING

Krotz Springs and Parco have standing to seek review of EPA's denials of their petitions for small-refinery exemptions. *See Sierra Club v. EPA*, 292 F.3d 895, 900 (D.C. Cir. 2002); D.C. Cir. R. 28(a)(7). Petitioners are the "object of the action[s]" at issue, EPA's "action[s] ... ha[ve] caused [petitioners] injury, and ... a judgment preventing … the action[s] will redress [them].'" *Sierra Club*, 292 F.3d at 900 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561–62 (1992)). EPA's decisions deeming the refineries ineligible for 2024 exemptions will burden petitioners with compliance obligations for that year to the tune of tens of millions of dollars. *See* ADD-35–36; ADD-38. A judgment vacating and remanding EPA's decisions will redress that injury. *See ADX Commc'ns of Pensacola v. FCC*, 794 F.3d 74, 82 (D.C. Cir. 2015).

## STANDARD OF REVIEW

This Court "shall … hold unlawful and set aside" any agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C); *see HollyFrontier*, 594 U.S. at 388, 399. The Court interprets statutes de novo, without any deference to EPA. *See Loper Bright Enters. v. Raimondo*,

603 U.S. 369, 400 (2024). The Court decides jurisdictional issues de novo. *Mobley v. CIA*, 806 F.3d 568, 575 (D.C. Cir. 2015).

## ARGUMENT

## I. EPA wrongly determined that petitioners were ineligible for small-refinery exemptions.

EPA's denials of petitioners' requests for small-refinery exemptions are unlawful twice over. They violate the Clean Air Act's eligibility criteria for small-refinery exemptions. And they violate EPA's regulation regarding eligibility for small-refinery exemptions. Each error separately and independently requires vacatur.

### A. EPA's decisions violate the Clean Air Act.

In EPA's view, a refinery doesn't qualify for a small-refinery exemption unless it's below the 75,000-barrel throughput threshold for two consecutive years—"the calendar year for which the refinery is seeking an exemption and the prior year." JA018. That is wrong as a matter of statutory text, context, and structure, as well as Supreme Court precedent.

**1.** The plain text of the Clean Air Act makes hardship exemptions available to any refinery that qualifies as a "small refinery" and meets certain other conditions not relevant here. § 7545(o)(9)(B). The Clean

24

Air Act defines a "small refinery," in turn, as a "refinery for which the average aggregate daily crude oil throughput for *a* calendar year (as determined by dividing the aggregate throughput for *the* calendar year by the number of days in *the* calendar year) does not exceed 75,000 barrels." § 7545(o)(1)(K) (emphasis added). So under the Clean Air Act, a refinery is eligible for a hardship exemption if its average aggregate daily crude oil throughput is below 75,000 barrels for "a calendar year."

The plain text of the Clean Air Act forecloses EPA's two-year requirement. To begin, the term "calendar year" itself is singular. The articles accompanying "calendar year"—"a" and "the"—reinforce the point. Typically, "the indefinite article 'a'" refers to a "single" thing. *Niz-Chavez v. Garland*, 593 U.S. 155, 163 (2021); *see id.* at 161 ("'a' notice" means "'a' single document"). That's because the singular article *a* "can't be used with plural nouns." Bryan A. Garner, *Modern English Usage* 1195 (5th ed. 2022). The statute's repeated reference to "the calendar year" is equally telling, because "consistent use of the definite article in reference to" a subject "indicates that there is generally only one" subject at issue. *Rumsfeld v. Padilla*, 542 U.S. 426, 434 (2004).

25

Other uses of "calendar year" in the statute confirm the phrase is singular. If EPA were right that Congress intended to "stray a good way from ordinary English" by using "a calendar year" to mean *multiple* calendar years, one would expect to see some "evidence" of that unusual usage. *Niz-Chavez*, 593 U.S. at 163. Instead, the Clean Air Act consistently uses "calendar year" (singular) as an ordinary speaker would—to refer to one calendar year. *See, e.g.*, § 7545(o)(2)(A)(iv) ("calendar year 2006"); § 7545(o)(2)(B)(iii) ("calendar year 2022"); § 7545(o)(2)(B)(v) ("calendar year 2012").

Other provisions of § 7545 show that when Congress wants to refer to multiple years, "it knows how to say just that." *Trump v. Hawaii*, 585 U.S. 667, 692 (2018). Most notably, subparagraph (o)(7)(F) directs EPA to modify the renewable fuel volumes in certain circumstances, including when EPA has waived a sufficient percentage of the otherwise applicable volume requirement "for 2 consecutive years." § 7545(o)(7)(F). Had Congress intended "a calendar year" in the small-refinery definition to mean "2 consecutive years," "it presumably would have [said] so expressly as it did" a few paragraphs later. *Russello v. United States*, 464 U.S. 16, 23 (1983).

Consider also subparagraph (o)(5)(D). It permits refineries to carry forward compliance deficits, so long as they make up the shortfall "in the calendar year following the year in which the renewable fuel deficit is created." Congress thus clearly knew how to connect a requirement in one year with a requirement in the "following" year. But in the small-refinery definition, Congress didn't say a word about the refinery's output in one year and the "following" calendar year. As it previously has when interpreting the Renewable Fuel Standard statute, the Court should "presum[e] that Congress acts intentionally and purposely in [such] disparate inclusion or exclusion." *Sinclair Wyo.*, 114 F.4th at 709 (quoting *Russello*, 464 U.S. at 23).

**2.** Construing "a calendar year" to mean a *single* year also tracks the annual cadence of the broader Renewable Fuel Standard scheme. The statute's central provision requires that gasoline sold "on an annual average basis" contain certain amounts of renewable fuel. § 7545(o)(2)(A)(i). Congress set the volumes for the initial years of the program on an annual basis, § 7545(o)(2)(B)(i), and charged EPA with setting volumes "for calendar years" thereafter, § 7545(o)(2)(B)(ii)—a command EPA has consistently implemented by setting "annual

27

applicable volumes." *Alon Refin. Krotz Springs, Inc. v. EPA*, 936 F.3d 628, 636 (D.C. Cir. 2019).

The program's annual cadence continues from there. The Clean Air Act authorizes EPA to waive the volume requirement in whole or in part if the agency finds that compliance would cause severe economic or environmental harm or that there is an inadequate domestic supply. § 7545(o)(7)(A). Such waivers last a default of "1 year." § 7545(o)(7)(C).

Then, once required volumes are set, "each" year EPA must convert the required volumes into an "applicable percentage" "for a calendar year." § 7545(o)(3)(B); *see Wynnewood Refin. Co. v. EPA*, 77 F.4th 767, 773 (D.C. Cir. 2023). Refineries then demonstrate compliance with the applicable percentage by retiring RINs that are valid for "12 months as of the date of generation." § 7545(o)(5)(C). EPA has long "require[d] obligated parties to submit compliance reports on an annual basis." *Wynnewood*, 77 F.4th at 774.

The whole Renewable Fuel Standard program thus marches to an annual drumbeat—the very cadence embodied in the phrase "a calendar year." Against this backdrop, it is implausible that Congress would have

28

used this phrase to set an entirely different tempo for gauging small-refinery status.

EPA itself seemingly recognizes all of this. In defending its authority to limit exemptions to one year, EPA relied on the fact that the statute uses the articles "a" and "an" to signify that hardship petitions and EPA's evaluation thereof are "individual acts"; "creates new [Renewable Fuel Standard] obligations for a refinery on an annual basis"; and uses "specific duration" language to set "longer timeframe[s]." JA028–29 & n.101. Yet EPA ignored those same features of the statute in deciding that "a calendar year" in the small-refinery definition can actually mean *two* calendar years.

**3.** The Supreme Court has recognized that small-refinery status is measured in increments of one year, not two. In *HollyFrontier*, the Court illustrated how the small-refinery-exemption scheme works with the following hypothetical: (i) a refinery qualifies for the exemption in 2008 and 2009; (ii) then, "in 2010, because of an increase in production capacity, the refinery loses 'small refinery' status under § 7545(o)(1)(K)"; and (iii) "[o]ne year later, production capacity falls and the refinery *moves back into small refinery status for 2011*" and "receive[s] an 'extension'" of

29

the exemption for that year. 594 U.S. at 393 (emphasis added).  Substitute 2023 for 2010, and 2024 for 2011, and the Court could have been describing this case.

In its decision document, EPA brushed aside *HollyFrontier* as "merely providing an example."  JA019 n.47.  But this Court gives the Supreme Court's analysis greater weight.  "[U]nder this court's practice, 'carefully considered language of the Supreme Court, even if technically dictum, generally must be treated as authoritative.'"  *Hanson v. District of Columbia*, 120 F.4th 223, 234 n.4 (D.C. Cir. 2024) (citation omitted).  The Supreme Court understood that a refinery's eligibility for a hardship exemption turns on its throughput in one calendar year, regardless of its throughput in the prior year.

### B.    EPA's decisions violate its own regulation.

In addition to violating the Clean Air Act, EPA's ineligibility determinations are unlawful for a second, independent reason: They violate EPA's own regulation.  For petitioners, both "the most recent full calendar year prior to seeking an extension" and "the year … for which an exemption is sought" was 2024, when petitioners' refineries met the

definition of a "small refinery."  40 C.F.R. § 80.1441(e)(2)(iii).  So EPA erred in deeming petitioners ineligible for an extension for that reason, too.

**1.** "It is 'axiomatic' … 'that an agency is bound by its own regulations.'"  *Nat'l Env't Dev. Association's Clean Air Proj. v. EPA*, 752 F.3d 999, 1009 (D.C. Cir. 2014) (cleaned up).  This Court "reject[s]" an agency's action that "would contravene the plain text of its own regulations." *Norfolk S. Ry. v. Surface Transp. Bd.*, 72 F.4th 297, 307 (D.C. Cir. 2023) (citation omitted).  Except for the rare case of "genuin[e] ambigu[ity]," a court must give effect to the "plain language" of a regulation, and "no issue of deference" to the agency "arises." *Newman v. FERC*, 27 F.4th 690, 696, 698 (D.C. Cir. 2022) (citation omitted).

The plain text of EPA's eligibility regulation is clear.  A refinery is eligible for a small-refinery exemption if it meets the definition of "small refinery" in (1) "the most recent full calendar year prior to seeking an extension"; and (2) "the year … for which an exemption is sought."  40 C.F.R. § 80.1441(e)(2)(iii).  Petitioners applied in 2025 for exemptions from their 2024 obligations.  This means that, for petitioners, the "most recent full calendar year prior to seeking an extension" was 2024, and

"the year … for which an exemption is sought" was 2024 as well. As it's undisputed that petitioners' refineries both qualified as "small refineries" in 2024, petitioners satisfied both eligibility conditions in EPA's regulation and were eligible for small-refinery exemptions.

**2.** EPA nevertheless maintains that the regulation doesn't mean what it says. According to EPA, the regulation limits eligibility for a hardship exemption to a refinery below the throughput threshold "for the year for which the refinery is seeking an exemption and the prior year." JA017. This reading interprets "the most recent full calendar year prior to seeking an extension," 40 C.F.R. § 80.1441(e)(2)(iii)—the first eligibility condition—to mean "the most recent full calendar year prior to *the year for which an exemption is sought.*"

But had EPA intended that meaning, it knew how to express it. The italicized language is precisely what appears in the second eligibility condition. *See id.* (requiring a refinery to "meet the definition of 'small refinery' … for *the year … for which an exemption is sought*" (emphasis added)). EPA's choice *not* to repeat that language in the first eligibility condition signifies that EPA meant something different there. As this Court has recognized, "where drafters use a term in one provision but not

32

another, 'it is generally presumed' that the drafted acted 'intentionally and purposely in the disparate inclusion or exclusion.'" *Newman*, 27 F.4th at 698 (cleaned up) (applying *Russello* canon to FERC order).

EPA cannot muddy the regulation's clear text by pointing to stray statements in the preamble to the 2014 rule. *See* Doc. 2140652 at 17–18, (attempting to do just that). "The preamble to a rule is n[o] more binding than a preamble to a statute." *Nat'l Wildlife Fed'n v. EPA*, 286 F.3d 554, 569–70 (D.C. Cir. 2002). So when, as here, the "operative" regulatory text is "unambiguous," its meaning "cannot be controlled by language in the preamble." *Id.*; *see also Newman*, 27 F.4th at 696.

In any event, the rule's preamble is hardly as clear as EPA claims. EPA surely will, as it already has, point to the preamble statement that the rule "places the focus on the time period immediately prior to and during the desired exemption period, which we believe is most appropriate given the objectives of the provision." Doc. 2140652 at 17–18 (cleaned up) (quoting 79 Fed. Reg. at 42152). But an earlier sentence in the same paragraph stated that the rule focused not on the year "prior to … the desired exemption period," but rather—as reflected in the codified rule—

"the most recent full calendar year prior to *an application for hardship*." 79 Fed. Reg. at 42152 (emphasis added).

These "mixed signals from the preamble" make deference to EPA's interpretation of the rule especially inappropriate. *Saint Francis Med. Ctr. v. Azar*, 894 F.3d 290, 297 (D.C. Cir. 2018). Agencies may not create "unfair surprise" to regulated parties by demanding deference to an interpretation that "conflicts with a prior [one]." *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 155–56 (2012) (citation omitted).

**3.** Similar problems plague EPA's assertion that it has "consistently applied" its rule to require that refineries be below the throughput threshold for two consecutive years in all circumstances. Doc. 2140652 at 19. Again, even if that were true, the text of EPA's regulation is clear and therefore controlling. *Newman*, 27 F.4th at 696. Those aspects of EPA's adjudications command no deference because they in no way implicate EPA's "expertise and experience." *Gonzales v. Oregon*, 546 U.S. 243, 257 (2006). This Court, not EPA, is the expert in construing a commonplace phrase like "the most recent full calendar year prior to seeking an extension." 40 C.F.R. § 80.1441(e)(2)(iii).

Furthermore, EPA overstates the consistency of its past practice. Despite having adjudicated hundreds of exemption petitions, EPA has mustered just one example in which it applied the eligibility regulation in the way it did here—and that example issued eight years after EPA adopted the 2014 rule. *See* Doc. 2140652 at 19 (citing June 2022 Denial of Petitions for RFS Small Refinery Exemptions, EPA-420-R-22-011, tinyurl.com/3b49bkzd).

EPA also ignores that two years before that example, EPA's Administrator described the 2014 rule in line with its plain meaning, explaining that it focuses on throughput "during the desired exemption period and the year immediately preceding the petition." Wheeler Letter, *supra*, at 2. EPA's lone, belated example is a far cry from the sort of past agency practice that has any bearing on the meaning of its regulations. *See Christopher*, 567 U.S. at 155–56.

In sum, EPA's determination that petitioners are ineligible for exemptions under 40 C.F.R. § 80.1441(e)(2)(iii) violates the straightforward text of the regulation, and EPA musters no basis for construing the regulation to mean something other than what it says. EPA's violation of its eligibility regulation was "arbitrary, capricious, an abuse of discretion, or

35

otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), and independently warrants vacatur of its decision, *see Nat'l Env't Dev. Association's Clean Air Proj.*, 752 F.3d at 1009.

## II.  The Court has jurisdiction over petitioners' challenges to EPA's August 2025 exemption denials.

EPA "concedes that the Court may have jurisdiction to consider" petitioners' argument that the 2025 denials violated the plain meaning of the 2014 regulation.  Doc. 2143553 at 7.  Yet it contends that petitioners' other argument that the 2025 denials were inconsistent with the Clean Air Act is an untimely backdoor attack on the 2014 regulation. That's wrong.  Petitioners seek review of EPA's exemption denials, full stop.  Even if EPA were right that the petitions challenge the 2014 regulation, they would still be timely because both petitions fall within the Clean Air Act's exception to the 60-day deadline for petitions "based solely on grounds arising after" the deadline.  42 U.S.C. § 7607(b)(1). This Court has jurisdiction to consider all of petitioners' arguments.

### A.  Petitioners seek review of EPA's 2025 denials—not its 2014 regulation.

EPA rightly "concedes that the Court may have jurisdiction to consider" whether it misapplied its 2014 regulation in the 2025 denials.  Doc. 2143553 at 7.  Because EPA had never formally adopted its current

36

(mis)interpretation of that regulation before applying it to deny petition-
ers' exemption petitions, *see supra* p. 35, there can be no argument that
petitioners should have taken that issue to court any sooner.  So by all
accounts, this Court has jurisdiction to consider whether the 2025 denials
were inconsistent with the 2014 regulation—an argument that inde-
pendently requires vacatur.  *See supra* § I.B.

This Court also has jurisdiction to consider whether the 2025 deni-
als violate the Clean Air Act.  EPA's assertion that the argument is time-
barred fails out of the gate because it rests on the erroneous premise that
the petitions actually challenge the 2014 regulation.  In fact, petitioners
seek review of EPA's August 2025 denials of their exemption petitions
based on purported ineligibility.  Those denials are the "final action[s]"
for which the Act expressly authorizes judicial review, and these petitions
are timely because they were filed well within 60 days of the publication
of notice in the Federal Register.  42 U.S.C. § 7607(b)(1).  EPA's inappo-
site authorities don't support foreclosing judicial review here.

**1.**    **These actions timely challenge EPA's 2025
denials.**

From the outset, petitioners have expressly sought review of the
legality of EPA's August 2025 denials. Krotz Springs Pet., Doc. 2135532

(No. 25-1187); Parco Pet., Doc. 2138029 (No. 25-1197). Petitioners challenge whether EPA's stated basis for denying relief was consistent with the Clean Air Act. *See supra* § I.A. It wasn't, because the statute refers to a single calendar year—not two. *Id.* The Court can resolve petitioners' challenges without reference to the 2014 regulation simply by comparing the agency's decisions to the statute.

Notably, petitioners don't seek vacatur of EPA's *regulation*. They seek vacatur of EPA's *denials of their petitions*. So both "the substance" of petitioners' arguments and "the relief requested" refute EPA's "contention that th[ese] case[s] [are] 'back-door' challenge[s] to the [2014] regulation[]." *NRDC, Inc. v. EPA*, 824 F.2d 1146, 1150 (D.C. Cir. 1987) (en banc).

That EPA's August 2025 decisions involved applying the 2014 regulation doesn't transform petitioners' timely challenges to the August 2025 decisions into untimely challenges to the 2014 regulation. If it did, petitioners would be barred from judicial review entirely because the 2014 regulation was the only ground EPA invoked for denying the exemption. That can't be correct given that Section 7607(b)(1) expressly provides for judicial review of the August 2025 denial. "[L]egal

38

consequences will flow" from EPA's 2025 denials separate and apart from any effects of the 2014 regulation, as EPA's denials "mark the 'consummation'" of an entirely distinct "decisionmaking process," confirming that EPA's 2025 denials are new final actions from which petitioners timely sought review. *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (citation omitted).

This Court has long recognized that "'those affected' when an agency 'seeks to apply [a] rule' after the statute of limitations has passed 'may challenge that application on the grounds that it conflicts with the statute from which its authority derives.'" *Citizens for Resp. & Ethics in Wash. v. FEC*, 971 F.3d 340, 348 (D.C. Cir. 2020) (citation omitted). This remains true even if the petitioner "fail[ed] to exercise a prior opportunity to challenge the regulation." *Pub. Citizen v. NRC*, 901 F.2d 147, 152 n.1 (D.C. Cir. 1990) (citation omitted); *accord Alvin Lou Media, Inc. v. FCC*, 571 F.3d 1, 8 (D.C. Cir. 2009) ("challenges to an agency's application … of a previously promulgated rule" are timely "even if the period for review of the initial rulemaking has expired" (citation omitted)).

The reason is straightforward: "[R]egulations are capable of continuing application," so to bar challenges to later applications "would

effectively deny many parties ultimately affected by a rule an opportunity to question its validity." *Graceba Total Commc'ns, Inc. v. FCC*, 115 F.3d 1038, 1040–41 (D.C. Cir. 1997) (citation omitted).

This general principle is consistent with statutory provisions that, as here, limit the time to seek judicial review. Statutory time limits "only … cut off review directly from the order promulgating a rule," and so foreclose untimely *procedural* objections to the rule's promulgation. *Functional Music, Inc. v. FCC*, 274 F.2d 543, 546 (D.C. Cir. 1958); *see also Pub. Citizen*, 901 F.2d at 152 n.1. But while finality may demand a conclusive deadline as to procedural objections, the same is not true when an agency applies a substantively invalid regulation to a party in a new agency action. *Citizens for Resp. & Ethics in Wash.*, 971 F.3d at 348. In that scenario, the affected party can contest the regulation's application in the new action. *See id.* Petitioners' challenges are timely under this well-worn principle.

In its 2025 denials, EPA invoked the 2014 regulation as its sole basis for deeming petitioners' ineligible to receive small-refinery exemptions. JA018. Petitioners now seek relief from the agency "action[s]" announcing that determination of ineligibility. *See* 42 U.S.C. § 7607(b)(1).

By applying the regulation to deny petitioners their due under the Clean Air Act, EPA opened itself up to the argument that the regulation "conflicts with the statute from which its authority derives." *Citizens for Resp. & Ethics in Wash.*, 971 F.3d at 348 (citation omitted). Otherwise, agencies could adopt rules that conflict with their authorizing statutes or even the Constitution and apply them in perpetuity without any possibility of judicial review—exactly as EPA argues here.

### 2. EPA's authorities don't justify barring petitioners from challenging the 2025 denials.

EPA cites no case capable of justifying the absurd result its approach would produce. Nor can it muster any authority rejecting the general principle that parties may challenge the legality of agency actions that rest on earlier-issued regulations. Instead, EPA primarily relies on the *American Road & Transportation Builders Association* line of cases, none of which involved the agency's application of a regulation to the petitioner itself. *See Am. Rd. & Transp. Builders Ass'n v. EPA*, 588 F.3d 1109 (D.C. Cir. 2009) (*ARTBA I*); *Am. Rd. & Transp. Builders Ass'n v. EPA*, 705 F.3d 453 (D.C. Cir. 2013) (*ARTBA II*); *Am. Rd. & Transp. Builders Ass'n v. EPA*, 554 F. App'x 18 (D.C. Cir. 2014) (*ARTBA III*).

41

In *ARTBA I* and *ARTBA II*, the association "petitioned the Agency to revise the [challenged] regulations and then sought review in this court when the Agency denied its request," asking the Court to vacate the underlying regulations. *ARTBA III*, 554 F. App'x at 19–20; *see also ARTBA I*, 588 F.3d at 1110; *ARTBA II*, 705 F.3d at 455. Those cases addressed the distinct issue whether a party may restart the clock for judicial review by "petition[ing] the agency for amendment or rescission of the regulations and then … appeal[ing] the agency's decision." *ARTBA I*, 588 F.3d at 1112 (citation omitted).

While in *ARTBA II* and *ARTBA III* the association attempted to shoehorn "the[] same arguments" into a challenge to EPA's action "appl[ying]" the regulations to authorize California-specific emissions standards, EPA's action didn't entail applying the regulation *to the association itself*. *ARTBA III*, 554 F. App'x at 19–20; *accord ARTBA II*, 705 F.3d at 457–58. So these cases don't undermine the longstanding rule petitioners invoke here.

Reading the *ARTBA* cases to foreclose review here would create a conflict with *McLaughlin Chiropractic Associates, Inc. v. McKesson Corp.*, 606 U.S. 146 (2025). There, the Supreme Court held that a provision of

42

the Hobbs Act authorizing pre-enforcement review within 60 days doesn't override the default rule that Congress doesn't mean to "preclude judicial review" of agency action in as-applied contexts. 606 U.S. at 155–56 (citing *Bowen v. Mich. Acad. of Fam. Physicians*, 476 U.S. 667, 670 (1986)).

While Congress in the Clean Air Act chose to expressly preclude review when a regulation is applied to a party in enforcement proceedings, *see* 42 U.S.C. § 7607(b)(2); *McLaughlin*, 606 U.S. at 154, it didn't do so outside the enforcement context, *see* § 7607(b)(1). All agree that this case doesn't involve an enforcement proceeding. *See* Doc. 2140652 at 17 n.6. So there's no "persuasive reason to believe" Congress intended to override the default rule here and prevent petitioners from contesting the application of EPA's 2014 regulation to them. *McLaughlin*, 606 U.S. at 155–56 (quoting *Bowen*, 476 U.S. at 670).

In addition, construing § 7607(b)(1) to bar petitioners' challenges here would raise serious constitutional concerns. This Court has long recognized "the 'nagging presence of a substantial due process question'" that would arise if § 7607(b)(2) were applied to abridge "the right to challenge the validity of a regulation to which one is subject." *ARTBA II*, 705 F.3d at 457 n.2 (citation omitted) (first quote); *Chrysler Corp. v. EPA*, 600

43

F.2d 904, 913 (D.C. Cir. 1979) (citation omitted) (second quote); *accord*

*McLaughlin,* 606 U.S. at 158 n.5.    This Court should construe

§ 7607(b)(1) in a manner that avoids those constitutional concerns. *See*

*Zadvydas v. Davis*, 533 U.S. 678, 689 (2001).

EPA's denial of small-refinery exemptions implicates petitioners'

due process rights.  Entitlements "give rise to property interests pro-

tected by the Due Process Clause," *NB ex rel. Peacock v. District of Co-*

*lumbia*, 794 F.3d 31, 41 (D.C. Cir. 2015), and a small-refinery exemption

"is 'an entitlement expressly created by statute,'" *Calumet Shreveport Re-*

*fin., LLC v. EPA*, 86 F.4th 1121, 1134 (5th Cir. 2023) (citation omitted),

*vacated and remanded on other grounds*, 605 U.S. 609 (2025).  Serious

due process problems would arise if petitioners were denied that entitle-

ment without any opportunity to challenge the basis of the denial. *See*

*McLaughlin*, 606 U.S. at 158 n.5.  This Court should avoid those prob-

lems by interpreting § 7607(b)(1) to "adher[e] to the default rule of allow-

ing judicial review" in this context. *Id.*; *see supra* § II.A.1.

Beyond the *ARTBA* line of cases, EPA offers only a handful of inap-

posite authorities.  In *Medical Waste Institute & Energy Recovery Council*

*v. EPA*, this Court held that parties may not challenge a new rule

44

maintaining a "longstanding practice" established in an old, unchallenged rule to lodge an attack on the old rule. 645 F.3d 420, 427 (D.C. Cir. 2011). Here, there's no new rule, so cases rejecting attempts to smuggle old challenges in via new rules don't apply.[3] Similarly off point is *Sierra Club de Puerto Rico v. EPA*, because the petitioner there sought vacatur of an old rule that the agency never applied to it. 815 F.3d 22, 23, 25 (D.C. Cir. 2016). The upshot is that EPA doesn't identify any authority precluding petitioners from challenging EPA's 2025 decisions.

## B. After-arising grounds independently render the challenges timely.

Even if EPA were correct that the petitions challenge the 2014 regulation, they would still be timely because they fall within the Clean Air Act's exception to the 60-day deadline for petitions "based solely on grounds arising after" the deadline. 42 U.S.C. § 7607(b)(1).

That exception ensures that regulated parties whose claims are unripe at the time EPA acts "will not be foreclosed from judicial review"

---

[3] *See also Ctr. for Biological Diversity v. EPA*, 141 F.4th 153, 193–94 (D.C. Cir. 2025) (per curiam) (challenged aspect of regulation simply "continue[d] to allow" something prior rules had already authorized); *Nat'l Ass'n of Reversionary Prop. Owners v. Surface Transp. Bd.*, 158 F.3d 135, 137 (D.C. Cir. 1998) (challenged policy was established in "previous rulemaking" that "the rulemaking under review did not reopen").

when they later feel the effects. *Coal. for Responsible Regul., Inc. v. EPA*, 684 F.3d 102, 131 (D.C. Cir. 2012) (quoting *Grand Canyon Air Tour Coal. v. FAA*, 154 F.3d 455, 473 (D.C. Cir. 1998)) (citation omitted), *rev'd in part on other grounds sub nom. Util. Air Regul. Grp. v. EPA*, 573 U.S. 302 (2014).

As this Court has consistently held, if a party's asserted injury is "too speculative to support judicial review" during the initial window, the exception still provides an avenue into court once a "subsequent factual or legal development creates new legal consequences" that ripen the claim. *Am. Lung Ass'n v. EPA*, 985 F.3d 914, 973–74 (D.C. Cir. 2021) (per curiam) (citation and alteration omitted), *rev'd and remanded on other grounds sub nom. West Virginia v. EPA*, 597 U.S. 697 (2022).

That's the case here for two reasons. First, petitioners couldn't have challenged the 2014 regulation until EPA's 2025 denials because that was the first time EPA's regulation affected their eligibility for small-refinery exemptions. Second, EPA's 2025 denials were also the first time EPA harmed petitioners based on its misreading of the 2014 regulation's plain text. These new developments constitute after-arising

grounds that ripened petitioners' claims, and EPA fails to show otherwise. Petitioners' challenges are timely.

### 1. The refineries' increase in throughput in 2023 constitutes an after-arising factual development.

The 2014 regulation—even under EPA's present interpretation—didn't affect petitioners' eligibility for an exemption until now because neither refinery exceeded the 75,000 barrel-per-day throughput cutoff to qualify as a small refinery until 2023. No. 25-1197, Doc. 2139286 at 16–17; No. 25-1187, Doc. 2135663 at 15. So EPA's adjudication of their petitions for 2024 exemptions was the first time since the regulation issued in which either refinery could have been deemed ineligible based on a different year's throughput levels. Any challenge to the 2014 regulation before now would have been premature since it "lack[ed] current impact" on petitioners and its "future impact … remain[ed] speculative." *Balt. Gas & Elec. Co. v. ICC*, 672 F.2d 146, 149 (D.C. Cir. 1982).

EPA asserts that because petitioners have been subject to the regulation since 2014, they could've brought their challenges earlier. Doc. 2143553 at 11–12. But this Court has long held that merely being subject to a binding legal requirement doesn't yield a ripe claim, *see Balt. Gas & Elec.*, 672 F.2d at 149, and EPA doesn't explain why the regulation's mere

47

existence would have created a justiciable controversy while the refineries' throughput stayed under the cutoff—and might have remained so indefinitely.

As this Court explained in *Baltimore Gas & Electric*, just because a party becomes subject to a rule with which it disagrees doesn't automatically yield a ripe claim. There, a shipper disagreed with an Interstate Commerce Commission order interpreting when shippers could challenge rail rates as unreasonable under the Staggers Act. 672 F.2d at 148. The Court held that the challenge was unripe because the shipper couldn't "identify any current rate as unreasonable" under its interpretation of the statute, so "the future impact" of the Commission's order "remain[ed] speculative." *Id.* at 148–49. The shipper needed to wait; "[i]f and when" it could challenge a rate as unreasonable under its interpretation of the statute, judicial review would become available. *Id.* at 149–50.

EPA attempts to brush aside *Baltimore Gas & Electric* because (1) it didn't interpret the Clean Air Act, and (2) the Commission's order supposedly "imposed no obligation" on the shipper. Doc. 2143553 at 12. But the first distinction is irrelevant, because *Baltimore Gas & Electric*'s ripeness holding didn't turn on the particular statute at issue. And the

48

second distinction is incorrect, because the shipper was obligated to fol-
low the Commission's framework for challenging unreasonable rates. *See
Balt. Gas & Elec.*, 672 F.2d at 149. The same is true of petitioners and
the 2014 regulation. That regulation bound petitioners from its incep-
tion, yet had no impact on them until now. As a result, any earlier chal-
lenges by petitioners would have been unripe. *See id.* at 148.

EPA can't alter that conclusion by characterizing its 2025 denials
as the mere application of an old regulation to petitioners. Doc. 2140652
at 15; Doc. 2140636 at 14. A "factual or legal development" that creates
"new legal consequences for petitioners"—as here—isn't a "mere applica-
tion of an old regulation," because it ripens a claim that was previously
unripe. *Sierra Club de P.R.*, 815 F.3d at 27–28. That's why cases holding
petitions time-barred emphasize that the petitioner's claims ripened at
an earlier time and should have been brought then. *See id.* at 28; *ARTBA
II*, 705 F.3d at 457. Here, petitioners' claims didn't ripen until the 2025
denials, and EPA offers no serious reason to think otherwise. Accord-
ingly, the refineries' increase in throughput in 2023 constituted a factual
change that, combined with EPA's exemption denials, ripened a previ-
ously nonjusticiable claim.

2.    **EPA's misinterpretation of the regulation's plain language constitutes an after-arising legal development.**

EPA's 2014 regulation requires an exemption seeker to show that its refinery's throughput fell below the cutoff for "the most recent full calendar year prior to seeking an extension" and the year "for which an exemption is sought."  40 C.F.R. § 80.1441(e)(2)(iii).  As the then-EPA Administrator acknowledged in 2020, this regulation means what it says: to be eligible, a refinery must be below the throughput threshold "during the desired exemption period and the year immediately preceding the petition."  Wheeler Letter, *supra*, at 2.  Under the regulation's plain language, a refinery in petitioners' position would reasonably have expected to be deemed eligible for a hardship exemption if it was a "small refinery" in 2024 and applied for a 2024 exemption in 2025, as in that circumstance both eligibility criteria are satisfied.

EPA conclusively revealed that it would be applying an atextual understanding of the regulation to petitioners' hardship petitions only when it issued the August denials.  EPA's departure from the regulatory text (and accompanying departure from the statute) changed the

regulation's requirements and amounts to an after-arising legal development. *See Am. Lung Ass'n*, 985 F.3d at 973–74.

Developments in the law that "change[] the legal landscape … constitute after-arising grounds." *Honeywell Int'l, Inc. v. EPA*, 705 F.3d 470, 473 (D.C. Cir. 2013).  In *Honeywell*, the Court recognized an after-arising ground when an intervening judicial opinion forced EPA to revise its legal position, allowing the petitioner to raise "merits arguments" that it "could not have raised" during the initial window for judicial review.  *Id.*  In the same way, petitioners here couldn't have challenged EPA's erroneous interpretation of the 2014 regulation's text until EPA applied that interpretation against petitioners for the first time in 2025.

Despite conceding that petitioners timely raised the question whether EPA misapplied its 2014 regulation in the 2025 denials, Doc. 2143553 at 7, EPA insists that its interpretation of the regulation's plain text isn't an after-arising legal development.  That assertion lacks merit.  So too does EPA's argument that its interpretation has remained unchanged based on the regulatory preamble, for the reasons discussed previously.  *See* Doc. 2143553 at 13; *supra* p. 33.  EPA insists it has always applied the regulation the same way, but points to only one previous

51

example—an individualized adjudication of a small-refinery exemption request in 2022. *See* Doc. 2143553 at 13. Even EPA doesn't argue that petitioners could or should have brought their challenges then.

EPA also asserts its interpretation isn't new because, since 2014, petitioners have been required to submit "two years of data" to receive an exemption. *See* Doc. 2143553 at 13–14. That argument makes little sense. EPA's information-gathering procedures hardly put petitioners on notice of EPA's ultimate misreading of its regulation. (And in any event, those procedures didn't previously injure petitioners.) The regulation requires refineries to meet the definition of a small refinery in "the most recent full calendar year prior to seeking an extension" and the year "for which an exemption is sought." 40 C.F.R. § 80.1441(e)(2)(iii). Those year-long periods can coincide—as they did here. EPA can't credibly dispute that its requirements for granting an exemption have changed since the regulation's promulgation.

EPA's position amounts to the assertion that petitioners should have brought their challenges in 2014 before they felt any concrete effects from the regulation and before there was any indication EPA would abandon the regulation's text. Such challenges would have been unripe and

52

speculative.  Because petitioners now feel those effects from the August 2025 denials, petitioners are entitled to the benefit of this Court's "assur[ance]" that "they will not be foreclosed from judicial review when the appropriate time comes."  *Coal. for Responsible Regul.*, 684 F.3d at 131 (citation omitted).  That time is now.

## CONCLUSION

The Court should vacate EPA's decisions and remand for EPA to consider Krotz Springs' and Parco's exemption petitions on their merits.  For the reasons set forth in their motions to sever and expedite these cases, *see* Doc. 2137090 (No. 25-1187); Doc. 2139286 (No. 25-1197), petitioners respectfully request that the Court issue such relief by a date that enables EPA to decide petitioners' exemption petitions at least 21 days before the deadline for complying with petitioners' 2025 obligations under the Renewable Fuel Standard, which is currently March 31, 2026.  Petitioners further respectfully request that the Court direct EPA to decide petitioners' exemption petitions at least 21 days before the 2025 compliance deadline under the Renewable Fuel Standard.

Dated: December 9, 2025

Respectfully submitted,

*/s/ Allyson N. Ho*

Allyson N. Ho
  *Counsel of Record*
Stephen J. Hammer
Robert W. Frey
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2100
Dallas, TX 75201
(214) 698-3100
aho@gibsondunn.com

Christine M. Buzzard
Lavi M. Ben Dor
M. Christian Talley
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, NW
Washington, DC 20036
(202) 955-8500

*Counsel for Petitioners*
*in No. 25-1197*

*/s/ Daniel J. Feith*

Daniel J. Feith
  *Counsel of Record*
Peter C. Whitfield
Peter A. Bruland
Cody M. Akins
SIDLEY AUSTIN LLP
1501 K Street, NW
Washington, DC 20005
(202) 736-8000
dfeith@sidley.com

*Counsel for Petitioner*
*in No. 25-1187*

## CERTIFICATE OF COMPLIANCE

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

This brief complies with the type-volume requirements of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 10,400 words, not counting the parts excluded by Federal Rule of Appellate Procedure 32(f) and Circuit Rule 32(e)(1).

*/s/ Daniel J. Feith*
Daniel J. Feith

## CERTIFICATE OF SERVICE

I certify that on December 9, 2025, a copy of this document was electronically filed with the Clerk of Court using the CM/ECF system. Notice of this filing will be sent to all counsel of record by operation of the Court's electronic filing system.

*/s/ Daniel J. Feith*
Daniel J. Feith

Addendum

ORAL ARGUMENT NOT YET SCHEDULED

Nos. 25-1187 & 25-1197

# In the United States Court of Appeals for the District of Columbia Circuit

———————

ALON REFINING KROTZ SPRINGS, INC.,
*Petitioner*,

v.

U.S. ENVIRONMENTAL PROTECTION AGENCY,
*Respondent.*

———————

HF SINCLAIR REFINING & MARKETING LLC AND
HF SINCLAIR PARCO REFINING LLC,
*Petitioners*,

v.

U.S. ENVIRONMENTAL PROTECTION AGENCY,
*Respondent.*

———————

On Petition for Review of a Final Decision of the
Environmental Protection Agency, 90 Fed. Reg. 41,829 (Aug. 27, 2025)

———————

## PETITIONERS' ADDENDUM

———————

Allyson N. Ho
  *Counsel of Record*
Stephen J. Hammer
Robert W. Frey
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2100
Dallas, TX 75201
(214) 698-3100
aho@gibsondunn.com

*Counsel for Petitioners in
No. 25-1197*

Daniel J. Feith
  *Counsel of Record*
Peter C. Whitfield
Peter A. Bruland
Cody M. Akins
SIDLEY AUSTIN LLP
1501 K Street, NW
Washington, DC 20005
(202) 736-8000
dfeith@sidley.com

*Counsel for Petitioner in
No. 25-1187*

(additional counsel listed on inside cover)

Christine M. Buzzard
Lavi M. Ben Dor
M. Christian Talley
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, NW
Washington, DC 20036
(202) 955-8500

*Counsel for Petitioners in No. 25-1197*

# TABLE OF CONTENTS

**Page**

**PRIMARY STATUTES & REGULATIONS**

A       42 U.S.C. § 7545(*o*) ....................................................ADD-1

B       42 U.S.C. § 7607(b)....................................................ADD-29

C       40 C.F.R. § 80.1441....................................................ADD-31

D       40 C.F.R. § 80.2........................................................ADD-34

**STANDING DECLARATIONS**

E       Corrected Declaration of Joseph Israel
        (Sept. 25, 2025) ........................................................ADD-35

F       Declaration of Mike Remy (Oct. 7, 2025) ..............ADD-37

# PRIMARY STATUTES & REGULATIONS

**A.    42 U.S.C. § 7545(*o*)**

* * *

**(o)    Renewable fuel program**

**(1)    Definitions**

In this section:

**(A)    Additional renewable fuel**

The term "additional renewable fuel" means fuel that is produced from renewable biomass and that is used to replace or reduce the quantity of fossil fuel present in home heating oil or jet fuel.

**(B)    Advanced biofuel**

**(i)    In general**

**(ii)**    The term "advanced biofuel" means renewable fuel, other than ethanol derived from corn starch, that has lifecycle greenhouse gas emissions, as determined by the Administrator, after notice and opportunity for comment, that are at least 50 percent less than baseline lifecycle greenhouse gas emissions.

**(iii)    Inclusions**

The types of fuels eligible for consideration as "advanced biofuel" may include any of the following:

**(I)**    Ethanol derived from cellulose, hemicellulose, or lignin.

**(II)**    Ethanol derived from sugar or starch (other than corn starch).

**(III)** Ethanol derived from waste material, including crop residue, other vegetative waste material, animal waste, and food waste and yard waste.

**(IV)** Biomass-based diesel.

**(V)** Biogas (including landfill gas and sewage waste treatment gas) produced through the conversion of organic matter from renewable biomass.

**(VI)** Butanol or other alcohols produced through the conversion of organic matter from renewable biomass.

**(VII)** Other fuel derived from cellulosic biomass.

**(C) Baseline lifecycle greenhouse gas emissions**

The term "baseline lifecycle greenhouse gas emissions" means the average lifecycle greenhouse gas emissions, as determined by the Administrator, after notice and opportunity for comment, for gasoline or diesel (whichever is being replaced by the renewable fuel) sold or distributed as transportation fuel in 2005.

**(D) Biomass-based diesel**

The term "biomass-based diesel" means renewable fuel that is biodiesel as defined in section 13220(f) of this title and that has lifecycle greenhouse gas emissions, as determined by the Administrator, after notice and opportunity for comment, that are at least 50 percent less than the baseline lifecycle greenhouse gas emissions. Notwithstanding the preceding sentence, renewable fuel derived from co-processing biomass with a petroleum feedstock shall be advanced biofuel if it meets the requirements of subparagraph (B), but is not biomass-based diesel.

**(E)  Cellulosic biofuel**

The term "cellulosic biofuel" means renewable fuel derived from any cellulose, hemicellulose, or lignin that is derived from renewable biomass and that has lifecycle greenhouse gas emissions, as determined by the Administrator, that are at least 60 percent less than the baseline lifecycle greenhouse gas emissions.

**(F)  Conventional biofuel**

The term "conventional biofuel" means renewable fuel that is ethanol derived from corn starch.

**(G)  Greenhouse gas**

The term "greenhouse gas" means carbon dioxide, hydrofluorocarbons, methane, nitrous oxide, perfluorocarbons,[8] sulfur hexafluoride. The Administrator may include any other anthropogenically-emitted gas that is determined by the Administrator, after notice and comment, to contribute to global warming.

**(H)  Lifecycle greenhouse gas emissions**

The term "lifecycle greenhouse gas emissions" means the aggregate quantity of greenhouse gas emissions (including direct emissions and significant indirect emissions such as significant emissions from land use changes), as determined by the Administrator, related to the full fuel lifecycle, including all stages of fuel and feedstock production and distribution, from feedstock generation or extraction through the distribution and delivery and use of the finished fuel to the ultimate consumer, where the mass values for all greenhouse gases are adjusted to account for their relative global warming potential.

---

[8] So in original. The word "and" probably should appear.

ADD-3

**(I)     Renewable biomass**

The term "renewable biomass" means each of the following:

**(i)**     Planted crops and crop residue harvested from agricultural land cleared or cultivated at any time prior to December 19, 2007, that is either actively managed or fallow, and nonforested.

**(ii)**     Planted trees and tree residue from actively managed tree plantations on non-federal[9] land cleared at any time prior to December 19, 2007, including land belonging to an Indian tribe or an Indian individual, that is held in trust by the United States or subject to a restriction against alienation imposed by the United States.

**(iii)**     Animal waste material and animal byproducts.

**(iv)**     Slash and pre-commercial thinnings that are from non-federal[9] forestlands, including forestlands belonging to an Indian tribe or an Indian individual, that are held in trust by the United States or subject to a restriction against alienation imposed by the United States, but not forests or forestlands that are ecological communities with a global or State ranking of critically imperiled, imperiled, or rare pursuant to a State Natural Heritage Program, old growth forest, or late successional forest.

**(v)**     Biomass obtained from the immediate vicinity of buildings and other areas regularly occupied by people, or of public infrastructure, at risk from wildfire.

**(vi)**     Algae.

---

[9] So in original. Probably should be non-Federal.

ADD-4

**(vii)** Separated yard waste or food waste, including recycled cooking and trap grease.

**(J) Renewable fuel**

The term "renewable fuel" means fuel that is produced from renewable biomass and that is used to replace or reduce the quantity of fossil fuel present in a transportation fuel.

**(K) Small refinery**

The term "small refinery" means a refinery for which the average aggregate daily crude oil throughput for a calendar year (as determined by dividing the aggregate throughput for the calendar year by the number of days in the calendar year) does not exceed 75,000 barrels.

**(L) Transportation fuel**

The term "transportation fuel" means fuel for use in motor vehicles, motor vehicle engines, nonroad vehicles, or nonroad engines (except for ocean-going vessels).

**(2) Renewable fuel program**

**(A) Regulations**

**(i) In general**

Not later than 1 year after August 8, 2005, the Administrator shall promulgate regulations to ensure that gasoline sold or introduced into commerce in the United States (except in noncontiguous States or territories), on an annual average basis, contains the applicable volume of renewable fuel determined in accordance with subparagraph (B). Not later than 1 year after December 19, 2007, the Administrator shall revise the regulations under this paragraph to ensure that transportation fuel sold or introduced into commerce in the

United States (except in noncontiguous States or territories), on an annual average basis, contains at least the applicable volume of renewable fuel, advanced biofuel, cellulosic biofuel, and biomass-based diesel, determined in accordance with subparagraph (B) and, in the case of any such renewable fuel produced from new facilities that commence construction after December 19, 2007, achieves at least a 20 percent reduction in lifecycle greenhouse gas emissions compared to baseline lifecycle greenhouse gas emissions.

**(ii)  Noncontiguous State opt-in**

**(I)  In general**

On the petition of a noncontiguous State or territory, the Administrator may allow the renewable fuel program established under this subsection to apply in the noncontiguous State or territory at the same time or any time after the Administrator promulgates regulations under this subparagraph.

**(II)  Other actions**

In carrying out this clause, the Administrator may—

**(aa)** issue or revise regulations under this paragraph;

**(bb)** establish applicable percentages under paragraph (3);

**(cc)** provide for the generation of credits under paragraph (5); and

**(dd)** take such other actions as are necessary to allow for the application of the

renewable fuels program in a noncontiguous State or territory.

**(iii)  Provisions of regulations**

Regardless of the date of promulgation, the regulations promulgated under clause (i)—

**(I)**  shall contain compliance provisions applicable to refineries, blenders, distributors, and importers, as appropriate, to ensure that the requirements of this paragraph are met; but

**(II)**  shall not—

**(aa)**  restrict geographic areas in which renewable fuel may be used; or

**(bb)**  impose any per-gallon obligation for the use of renewable fuel.

**(iv)  Requirement in case of failure to promulgate regulations**

If the Administrator does not promulgate regulations under clause (i), the percentage of renewable fuel in gasoline sold or dispensed to consumers in the United States, on a volume basis, shall be 2.78 percent for calendar year 2006.

**(B)  Applicable volumes**

**(i)  Calendar years after 2005**

**(I)  Renewable fuel**

For the purpose of subparagraph (A), the applicable volume of renewable fuel for the calendar years 2006 through 2022 shall be determined in accordance with the following table:

| Calendar year: | Applicable volume of renewable fuel (in billions of gallons): |
|---|---|
| 2006 | 4.0 |
| 2007 | 4.7 |
| 2008 | 9.0 |
| 2009 | 11.1 |
| 2010 | 12.95 |
| 2011 | 13.95 |
| 2012 | 15.2 |
| 2013 | 16.55 |
| 2014 | 18.15 |
| 2015 | 20.5 |
| 2016 | 22.25 |
| 2017 | 24.0 |
| 2018 | 26.0 |
| 2019 | 28.0 |
| 2020 | 30.0 |
| 2021 | 33.0 |
| 2022 | 36.0 |

### (II)  Advanced biofuel

For the purpose of subparagraph (A), of the volume of renewable fuel required under subclause (I), the applicable volume of advanced biofuel for the calendar years 2009 through 2022 shall be determined in accordance with the following table:

ADD-8

| Calendar year: | Applicable volume of advanced biofuel (in billions of gallons): |
|---|---|
| 2009 | 0.6 |
| 2010 | 0.95 |
| 2011 | 1.35 |
| 2012 | 2.0 |
| 2013 | 2.75 |
| 2014 | 3.75 |
| 2015 | 5.5 |
| 2016 | 7.25 |
| 2017 | 9.0 |
| 2018 | 11.0 |
| 2019 | 13.0 |
| 2020 | 15.0 |
| 2021 | 18.0 |
| 2022 | 21.0 |

### (III) Cellulosic biofuel

For the purpose of subparagraph (A), of the volume of advanced biofuel required under subclause (II), the applicable volume of cellulosic biofuel for the calendar years 2010 through 2022 shall be determined in accordance with the following table:

| Calendar year: | Applicable volume of cellulosic biofuel (in billions of gallons): |
|---|---|
| 2010 | 0.1 |
| 2011 | 0.25 |
| 2012 | 0.5 |
| 2013 | 1.0 |
| 2014 | 1.75 |
| 2015 | 3.0 |
| 2016 | 4.25 |
| 2017 | 5.5 |
| 2018 | 7.0 |
| 2019 | 8.5 |
| 2020 | 10.5 |
| 2021 | 13.5 |
| 2022 | 16.0 |

**(IV) Biomass-based diesel**

For the purpose of subparagraph (A), of the volume of advanced biofuel required under subclause (II), the applicable volume of biomass-based diesel for the calendar years 2009 through 2012 shall be determined in accordance with the following table:

| Calendar year: | Applicable volume of biomass-based diesel (in billions of gallons): |
|---|---|
| 2009 | 0.5 |
| 2010 | 0.65 |
| 2011 | 0.80 |
| 2012 | 1.0 |

**(ii)  Other calendar years**

For the purposes of subparagraph (A), the applicable volumes of each fuel specified in the tables in clause (i) for calendar years after the calendar years specified in the tables shall be determined by the Administrator, in coordination with the Secretary of Energy and the Secretary of Agriculture, based on a review of the implementation of the program during calendar years specified in the tables, and an analysis of—

**(I)**   the impact of the production and use of renewable fuels on the environment, including on air quality, climate change, conversion of wetlands, ecosystems, wildlife habitat, water quality, and water supply;

**(II)**  the impact of renewable fuels on the energy security of the United States;

**(III)** the expected annual rate of future commercial production of renewable fuels, including advanced biofuels in each category (cellulosic biofuel and biomass-based diesel);

**(IV)** the impact of renewable fuels on the infrastructure of the United States, including deliverability of materials, goods, and products other   than   renewable   fuel,   and   the

ADD-11

sufficiency of infrastructure to deliver and use renewable fuel;

**(V)** the impact of the use of renewable fuels on the cost to consumers of transportation fuel and on the cost to transport goods; and

**(VI)** the impact of the use of renewable fuels on other factors, including job creation, the price and supply of agricultural commodities, rural economic development, and food prices.

The Administrator shall promulgate rules establishing the applicable volumes under this clause no later than 14 months before the first year for which such applicable volume will apply.

### (iii) Applicable volume of advanced biofuel

For the purpose of making the determinations in clause (ii), for each calendar year, the applicable volume of advanced biofuel shall be at least the same percentage of the applicable volume of renewable fuel as in calendar year 2022.

### (iv) Applicable volume of cellulosic biofuel

For the purpose of making the determinations in clause (ii), for each calendar year, the applicable volume of cellulosic biofuel established by the Administrator shall be based on the assumption that the Administrator will not need to issue a waiver for such years under paragraph (7)(D).

### (v) Minimum applicable volume of biomass-based diesel

For the purpose of making the determinations in clause (ii), the applicable volume of biomass-based diesel shall not be less than the applicable volume listed in clause (i)(IV) for calendar year 2012.

**(3)   Applicable percentages**

**(A)   Provision of estimate of volumes of gasoline sales**

Not later than October 31 of each of calendar years 2005 through 2021, the Administrator of the Energy Information Administration shall provide to the Administrator of the Environmental Protection Agency an estimate, with respect to the following calendar year, of the volumes of transportation fuel, biomass-based diesel, and cellulosic biofuel projected to be sold or introduced into commerce in the United States.

**(B)   Determination of applicable percentages**

**(i)   In general**

Not later than November 30 of each of calendar years 2005 through 2021, based on the estimate provided under subparagraph (A), the Administrator of the Environmental Protection Agency shall determine and publish in the Federal Register, with respect to the following calendar year, the renewable fuel obligation that ensures that the requirements of paragraph (2) are met.

**(ii)   Required elements**

The renewable fuel obligation determined for a calendar year under clause (i) shall—

**(I)**   be applicable to refineries, blenders, and importers, as appropriate;

**(II)**    be expressed in terms of a volume percentage of transportation fuel sold or introduced into commerce in the United States; and

**(III)**   subject to subparagraph (C)(i), consist of a single applicable percentage that applies to

ADD-13

all categories of persons specified in subclause (I).

**(C) Adjustments**

In determining the applicable percentage for a calendar year, the Administrator shall make adjustments—

**(i)** to prevent the imposition of redundant obligations on any person specified in subparagraph (B)(ii)(I); and

**(ii)** to account for the use of renewable fuel during the previous calendar year by small refineries that are exempt under paragraph (9).

**(4) Modification of greenhouse gas reduction percentages**

**(A) In general**

The Administrator may, in the regulations under the last sentence of paragraph (2)(A)(i), adjust the 20 percent, 50 percent, and 60 percent reductions in lifecycle greenhouse gas emissions specified in paragraphs (2)(A)(i) (relating to renewable fuel), (1)(D) (relating to biomass-based diesel), (1)(B)(i) (relating to advanced biofuel), and (1)(E) (relating to cellulosic biofuel) to a lower percentage. For the 50 and 60 percent reductions, the Administrator may make such an adjustment only if he determines that generally such reduction is not commercially feasible for fuels made using a variety of feedstocks, technologies, and processes to meet the applicable reduction.

**(B) Amount of adjustment**

In promulgating regulations under this paragraph, the specified 50 percent reduction in greenhouse gas emissions from advanced biofuel and in biomass-based diesel may not be reduced below 40 percent. The specified 20 percent reduction in greenhouse gas emissions from

ADD-14

renewable fuel may not be reduced below 10 percent, and the specified 60 percent reduction in greenhouse gas emissions from cellulosic biofuel may not be reduced below 50 percent.

**(C) Adjusted reduction levels**

An adjustment under this paragraph to a percent less than the specified 20 percent greenhouse gas reduction for renewable fuel shall be the minimum possible adjustment, and the adjusted greenhouse gas reduction shall be established by the Administrator at the maximum achievable level, taking cost in consideration, for natural gas fired corn-based ethanol plants, allowing for the use of a variety of technologies and processes. An adjustment in the 50 or 60 percent greenhouse gas levels shall be the minimum possible adjustment for the fuel or fuels concerned, and the adjusted greenhouse gas reduction shall be established at the maximum achievable level, taking cost in consideration, allowing for the use of a variety of feedstocks, technologies, and processes.

**(D) 5-year review**

Whenever the Administrator makes any adjustment under this paragraph, not later than 5 years thereafter he shall review and revise (based upon the same criteria and standards as required for the initial adjustment) the regulations establishing the adjusted level.

**(E) Subsequent adjustments**

After the Administrator has promulgated a final rule under the last sentence of paragraph (2)(A)(i) with respect to the method of determining lifecycle greenhouse gas emissions, except as provided in subparagraph (D), the Administrator may not adjust the percent greenhouse gas reduction levels unless he determines that there has been a significant change in the analytical methodology used for determining the lifecycle

ADD-15

greenhouse gas emissions. If he makes such determination, he may adjust the 20, 50, or 60 percent reduction levels through rulemaking using the criteria and standards set forth in this paragraph.

**(F)  Limit on upward adjustments**

If, under subparagraph (D) or (E), the Administrator revises a percent level adjusted as provided in subparagraphs (A), (B), and (C) to a higher percent, such higher percent may not exceed the applicable percent specified in paragraph (2)(A)(i), (1)(D), (1)(B)(i), or (1)(E).

**(G)  Applicability of adjustments**

If the Administrator adjusts, or revises, a percent level referred to in this paragraph or makes a change in the analytical methodology used for determining the lifecycle greenhouse gas emissions, such adjustment, revision, or change (or any combination thereof) shall only apply to renewable fuel from new facilities that commence construction after the effective date of such adjustment, revision, or change.

**(5)  Credit program**

**(A)  In general**

The regulations promulgated under paragraph (2)(A) shall provide—

**(i)**  for the generation of an appropriate amount of credits by any person that refines, blends, or imports gasoline that contains a quantity of renewable fuel that is greater than the quantity required under paragraph (2);

**(ii)**  for the generation of an appropriate amount of credits for biodiesel; and

**(iii)** for the generation of credits by small refineries in accordance with paragraph (9)(C).

**(B)    Use of credits**

A person that generates credits under subparagraph (A) may use the credits, or transfer all or a portion of the credits to another person, for the purpose of complying with paragraph (2).

**(C)    Duration of credits**

A credit generated under this paragraph shall be valid to show compliance for the 12 months as of the date of generation.

**(D)    Inability to generate or purchase sufficient credits**

The regulations promulgated under paragraph (2)(A) shall include provisions allowing any person that is unable to generate or purchase sufficient credits to meet the requirements of paragraph (2) to carry forward a renewable fuel deficit on condition that the person, in the calendar year following the year in which the renewable fuel deficit is created—

**(i)** achieves compliance with the renewable fuel requirement under paragraph (2); and

**(ii)** generates or purchases additional renewable fuel credits to offset the renewable fuel deficit of the previous year.

**(E)    Credits for additional renewable fuel**

The Administrator may issue regulations providing: (i) for the generation of an appropriate amount of credits by any person that refines, blends, or imports additional renewable fuels specified by the Administrator; and (ii) for the use of such credits by the generator, or the

ADD-17

transfer of all or a portion of the credits to another person, for the purpose of complying with paragraph (2).

**(6)  Seasonal variations in renewable fuel use**

**(A)  Study**

For each of calendar years 2006 through 2012, the Administrator of the Energy Information Administration shall conduct a study of renewable fuel blending to determine whether there are excessive seasonal variations in the use of renewable fuel.

**(B)  Regulation of excessive seasonal variations**

If, for any calendar year, the Administrator of the Energy Information Administration, based on the study under subparagraph (A), makes the determinations specified in subparagraph (C), the Administrator of the Environmental Protection Agency shall promulgate regulations to ensure that 25 percent or more of the quantity of renewable fuel necessary to meet the requirements of paragraph (2) is used during each of the 2 periods specified in subparagraph (D) of each subsequent calendar year.

**(C)  Determinations**

The determinations referred to in subparagraph (B) are that—

**(i)**  less than 25 percent of the quantity of renewable fuel necessary to meet the requirements of paragraph (2) has been used during 1 of the 2 periods specified in subparagraph (D) of the calendar year;

**(ii)**  a pattern of excessive seasonal variation described in clause (i) will continue in subsequent calendar years; and

ADD-18

**(iii)** promulgating regulations or other requirements to impose a 25 percent or more seasonal use of renewable fuels will not prevent or interfere with the attainment of national ambient air quality standards or significantly increase the price of motor fuels to the consumer.

**(D)  Periods**

The 2 periods referred to in this paragraph are—

**(i)** April through September; and

**(ii)** January through March and October through December.

**(E)  Exclusion**

Renewable fuel blended or consumed in calendar year 2006 in a State that has received a waiver under section 7543(b) of this title shall not be included in the study under subparagraph (A).

**(F)  State exemption from seasonality requirements**

Notwithstanding any other provision of law, the seasonality requirement relating to renewable fuel use established by this paragraph shall not apply to any State that has received a waiver under section 7543(b) of this title or any State dependent on refineries in such State for gasoline supplies.

**(7)  Waivers**

**(A)  In general**

The Administrator, in consultation with the Secretary of Agriculture and the Secretary of Energy, may waive the requirements of paragraph (2) in whole or in part on petition by one or more States, by any person subject to the requirements of this subsection, or by the Administrator

ADD-19

on his own motion by reducing the national quantity of renewable fuel required under paragraph (2)—

**(i)** based on a determination by the Administrator, after public notice and opportunity for comment, that implementation of the requirement would severely harm the economy or environment of a State, a region, or the United States; or

**(ii)** based on a determination by the Administrator, after public notice and opportunity for comment, that there is an inadequate domestic supply.

**(B) Petitions for waivers**

The Administrator, in consultation with the Secretary of Agriculture and the Secretary of Energy, shall approve or disapprove a petition for a waiver of the requirements of paragraph (2) within 90 days after the date on which the petition is received by the Administrator.

**(C) Termination of waivers**

A waiver granted under subparagraph (A) shall terminate after 1 year, but may be renewed by the Administrator after consultation with the Secretary of Agriculture and the Secretary of Energy.

**(D) Cellulosic biofuel**

**(i)** For any calendar year for which the projected volume of cellulosic biofuel production is less than the minimum applicable volume established under paragraph (2)(B), as determined by the Administrator based on the estimate provided under paragraph (3)(A), not later than November 30 of the preceding calendar year, the Administrator shall reduce the applicable volume of cellulosic biofuel required under paragraph (2)(B) to the projected volume available during that calendar year. For

any calendar year in which the Administrator makes such a reduction, the Administrator may also reduce the applicable volume of renewable fuel and advanced biofuels requirement established under paragraph (2)(B) by the same or a lesser volume.

**(ii)** Whenever the Administrator reduces the minimum cellulosic biofuel volume under this subparagraph, the Administrator shall make available for sale cellulosic biofuel credits at the higher of $0.25 per gallon or the amount by which $3.00 per gallon exceeds the average wholesale price of a gallon of gasoline in the United States. Such amounts shall be adjusted for inflation by the Administrator for years after 2008.

**(iii)** Eighteen months after December 19, 2007, the Administrator shall promulgate regulations to govern the issuance of credits under this subparagraph. The regulations shall set forth the method for determining the exact price of credits in the event of a waiver. The price of such credits shall not be changed more frequently than once each quarter. These regulations shall include such provisions, including limiting the credits' uses and useful life, as the Administrator deems appropriate to assist market liquidity and transparency, to provide appropriate certainty for regulated entities and renewable fuel producers, and to limit any potential misuse of cellulosic biofuel credits to reduce the use of other renewable fuels, and for such other purposes as the Administrator determines will help achieve the goals of this subsection. The regulations shall limit the number of cellulosic biofuel credits for any calendar year to the minimum applicable volume (as reduced under this subparagraph) of cellulosic biofuel for that year.

**(E)  Biomass-based diesel**

**(i)  Market evaluation**

The Administrator, in consultation with the Secretary of Energy and the Secretary of Agriculture, shall periodically evaluate the impact of the biomass-based diesel requirements established under this paragraph on the price of diesel fuel.

**(ii)  Waiver**

If the Administrator determines that there is a significant renewable feedstock disruption or other market circumstances that would make the price of biomass-based diesel fuel increase significantly, the Administrator, in consultation with the Secretary of Energy and the Secretary of Agriculture, shall issue an order to reduce, for up to a 60-day period, the quantity of biomass-based diesel required under subparagraph (A) by an appropriate quantity that does not exceed 15 percent of the applicable annual requirement for biomass-based diesel. For any calendar year in which the Administrator makes a reduction under this subparagraph, the Administrator may also reduce the applicable volume of renewable fuel and advanced biofuels requirement established under paragraph (2)(B) by the same or a lesser volume.

**(iii)  Extensions**

If the Administrator determines that the feedstock disruption or circumstances described in clause (ii) is continuing beyond the 60-day period described in clause (ii) or this clause, the Administrator, in consultation with the Secretary of Energy and the Secretary of Agriculture, may issue an order to reduce, for up to an additional 60-day period, the quantity of biomass-based diesel required under

subparagraph (A) by an appropriate quantity that does not exceed an additional 15 percent of the applicable annual requirement for biomass-based diesel.

**(F) Modification of applicable volumes**

For any of the tables in paragraph (2)(B), if the Administrator waives—

**(i)** at least 20 percent of the applicable volume requirement set forth in any such table for 2 consecutive years; or

**(ii)** at least 50 percent of such volume requirement for a single year,

the Administrator shall promulgate a rule (within 1 year after issuing such waiver) that modifies the applicable volumes set forth in the table concerned for all years following the final year to which the waiver applies, except that no such modification in applicable volumes shall be made for any year before 2016. In promulgating such a rule, the Administrator shall comply with the processes, criteria, and standards set forth in paragraph (2)(B)(ii).

**(8) Study and waiver for initial year of program**

**(A) In general**

Not later than 180 days after August 8, 2005, the Secretary of Energy shall conduct for the Administrator a study assessing whether the renewable fuel requirement under paragraph (2) will likely result in significant adverse impacts on consumers in 2006, on a national, regional, or State basis.

**(B) Required evaluations**

The study shall evaluate renewable fuel—

ADD-23

**(i)**    supplies and prices;

**(ii)**    blendstock supplies; and

**(iii)**    supply and distribution system capabilities.

**(C)    Recommendations by the Secretary**

Based on the results of the study, the Secretary of Energy shall make specific recommendations to the Administrator concerning waiver of the requirements of paragraph (2), in whole or in part, to prevent any adverse impacts described in subparagraph (A).

**(D)    Waiver**

**(i)    In general**

Not later than 270 days after August 8, 2005, the Administrator shall, if and to the extent recommended by the Secretary of Energy under subparagraph (C), waive, in whole or in part, the renewable fuel requirement under paragraph (2) by reducing the national quantity of renewable fuel required under paragraph (2) in calendar year 2006.

**(ii)    No effect on waiver authority**

Clause (i) does not limit the authority of the Administrator to waive the requirements of paragraph (2) in whole, or in part, under paragraph (7).

**(9)    Small refineries**

**(A)    Temporary exemption**

**(i)    In general**

The requirements of paragraph (2) shall not apply to small refineries until calendar year 2011.

**(ii)    Extension of exemption**

**(I)    Study by Secretary of Energy**

Not later than December 31, 2008, the Secretary of Energy shall conduct for the Administrator a study to determine whether compliance with the requirements of paragraph (2) would impose a disproportionate economic hardship on small refineries.

**(II)    Extension of exemption**

In the case of a small refinery that the Secretary of Energy determines under subclause (I) would be subject to a disproportionate economic hardship if required to comply with paragraph (2), the Administrator shall extend the exemption under clause (i) for the small refinery for a period of not less than 2 additional years.

**(B)    Petitions based on disproportionate economic hardship**

**(i)    Extension of exemption**

A small refinery may at any time petition the Administrator for an extension of the exemption under subparagraph (A) for the reason of disproportionate economic hardship.

**(ii)    Evaluation of petitions**

In evaluating a petition under clause (i), the Administrator, in consultation with the Secretary of Energy, shall consider the findings of the study under subparagraph (A)(ii) and other economic factors.

**(iii)** **Deadline for action on petitions**

The Administrator shall act on any petition submitted by a small refinery for a hardship exemption not later than 90 days after the date of receipt of the petition.

**(C)** **Credit program**

If a small refinery notifies the Administrator that the small refinery waives the exemption under subparagraph (A), the regulations promulgated under paragraph (2)(A) shall provide for the generation of credits by the small refinery under paragraph (5) beginning in the calendar year following the date of notification.

**(D)** **Opt-in for small refineries**

A small refinery shall be subject to the requirements of paragraph (2) if the small refinery notifies the Administrator that the small refinery waives the exemption under subparagraph (A).

**(10)** **Ethanol market concentration analysis**

**(A)** **Analysis**

**(i)** **In general**

Not later than 180 days after August 8, 2005, and annually thereafter, the Federal Trade Commission shall perform a market concentration analysis of the ethanol production industry using the Herfindahl-Hirschman Index to determine whether there is sufficient competition among industry participants to avoid price-setting and other anticompetitive behavior.

ADD-26

**(ii)  Scoring**

For the purpose of scoring under clause (i) using the Herfindahl-Hirschman Index, all marketing arrangements among industry participants shall be considered.

**(B)  Report**

Not later than December 1, 2005, and annually thereafter, the Federal Trade Commission shall submit to Congress and the Administrator a report on the results of the market concentration analysis performed under subparagraph (A)(i).

**(11)  Periodic reviews**

To allow for the appropriate adjustment of the requirements described in subparagraph (B) of paragraph (2), the Administrator shall conduct periodic reviews of—

**(A)**  existing technologies;

**(B)**  the feasibility of achieving compliance with the requirements; and

**(C)**  the impacts of the requirements described in subsection (a)(2)[10] on each individual and entity described in paragraph (2).

**(12)  Effect on other provisions**

Nothing in this subsection, or regulations issued pursuant to this subsection, shall affect or be construed to affect the regulatory status of carbon dioxide or any other greenhouse gas, or to expand or limit regulatory authority regarding carbon dioxide or any other greenhouse gas, for purposes of other provisions (including section 7475) of this chapter. The previous

---

[10] So in original. Subsection (a) does not contain a par. (2).

ADD-27

sentence shall not affect implementation and enforcement of this subsection.

## B.    42 U.S.C. § 7607(b)—Administrative Proceedings and Judicial Review

* * *

## (b)    Judicial review

**(1)**    A petition for review of action of the Administrator in promulgating any national primary or secondary ambient air quality standard, any emission standard or requirement under section 7412 of this title, any standard of performance or requirement under section 7411 of this title,[3] any standard under section 7521 of this title (other than a standard required to be prescribed under section 7521(b)(1) of this title), any determination under section 7521(b)(5)[1] of this title, any control or prohibition under section 7545 of this title, any standard under section 7571 of this title, any rule issued under section 7413, 7419, or under section 7420 of this title, or any other nationally applicable regulations promulgated, or final action taken, by the Administrator under this chapter may be filed only in the United States Court of Appeals for the District of Columbia. A petition for review of the Administrator's action in approving or promulgating any implementation plan under section 7410 of this title or section 7411(d) of this title, any order under section 7411(j) of this title, under section 7412 of this title, under section 7419 of this title, or under section 7420 of this title, or his action under section 1857c-10(c)(2)(A), (B), or (C) of this title (as in effect before August 7, 1977) or under regulations thereunder, or revising regulations for enhanced monitoring and compliance certification programs under section 7414(a)(3) of this title, or any other final action of the Administrator under this chapter (including any denial or disapproval by the Administrator under subchapter I) which is locally or regionally applicable may be filed only in the United States Court of Appeals for the appropriate circuit.

---

[1] Repealed. See References in Text notes set out under this section.

[3] So in original.

Notwithstanding the preceding sentence a petition for review of any action referred to in such sentence may be filed only in the United States Court of Appeals for the District of Columbia if such action is based on a determination of nationwide scope or effect and if in taking such action the Administrator finds and publishes that such action is based on such a determination. Any petition for review under this subsection shall be filed within sixty days from the date notice of such promulgation, approval, or action appears in the Federal Register, except that if such petition is based solely on grounds arising after such sixtieth day, then any petition for review under this subsection shall be filed within sixty days after such grounds arise. The filing of a petition for reconsideration by the Administrator of any otherwise final rule or action shall not affect the finality of such rule or action for purposes of judicial review nor extend the time within which a petition for judicial review of such rule or action under this section may be filed, and shall not postpone the effectiveness of such rule or action.

**(2)**    Action of the Administrator with respect to which review could have been obtained under paragraph (1) shall not be subject to judicial review in civil or criminal proceedings for enforcement. Where a final decision by the Administrator defers performance of any nondiscretionary statutory action to a later time, any person may challenge the deferral pursuant to paragraph (1).

## C.   40 C.F.R. § 80.1441—Small Refinery Exemption

(a)(1) Transportation fuel produced at a refinery by a refiner is exempt from January 1, 2010, through December 31, 2010, from the renewable fuel standards of § 80.1405, and the owner or operator of the refinery is exempt from the requirements that apply to obligated parties under this subpart M for fuel produced at the refinery if the refinery meets the definition of "small refinery" in § 80.2 for calendar year 2006.

(2)   The exemption of paragraph (a)(1) of this section shall apply unless a refiner chooses to waive this exemption (as described in paragraph (f) of this section), or the exemption is extended (as described in paragraph (e) of this section).

(3)   [Reserved by 88 FR 44586]

(4)   This exemption shall only apply to refineries that process crude oil through refinery processing units.

(5)   The small refinery exemption is effective immediately, except as specified in paragraph (b)(3) of this section.

(b)(1) A refiner owning a small refinery must submit a verification letter to EPA containing all of the following information:

(i)   The annual average aggregate daily crude oil throughput for the period January 1, 2006 through December 31, 2006 (as determined by dividing the aggregate throughput for the calendar year by the number 365).

(ii)   A letter signed by the president, chief operating or chief executive officer of the company, or his/her designee, stating that the information contained in the letter is true to the best of his/her knowledge, and that the refinery was small as of December 31, 2006.

(iii)   Name, address, phone number, facsimile number, and e-mail address of a corporate contact person.

(2)   Verification letters must be submitted by July 1, 2010 to one of the addresses listed in paragraph (h) of this section.

ADD-31

(c)    If EPA finds that a refiner provided false or inaccurate information regarding a refinery's crude throughput (pursuant to paragraph (b)(1)(i) of this section) in its small refinery verification letter, the exemption will be void as of the effective date of these regulations.

(d)    If a refiner is complying on an aggregate basis for multiple refineries, any such refiner may exclude from the calculation of its Renewable Volume Obligations (under § 80.1407) transportation fuel from any refinery receiving the small refinery exemption under paragraph (a) of this section.

(e)(1) The exemption period in paragraph (a) of this section shall be extended by EPA for a period of not less than two additional years if a study by the Secretary of Energy determines that compliance with the requirements of this subpart would impose a disproportionate economic hardship on a small refinery.

(2)    A refiner may petition EPA for an extension of its small refinery exemption, based on disproportionate economic hardship, at any time.

(i)    A petition for an extension of the small refinery exemption must specify the factors that demonstrate a disproportionate economic hardship and must provide a detailed discussion regarding the hardship the refinery would face in producing transportation fuel meeting the requirements of § 80.1405 and the date the refiner anticipates that compliance with the requirements can reasonably be achieved at the small refinery.

(ii)    EPA shall act on such a petition not later than 90 days after the date of receipt of the petition.

(iii)    In order to qualify for an extension of its small refinery exemption, a refinery must meet the definition of "small refinery" in § 80.2 for the most recent full calendar year prior to seeking an extension and must be projected to meet the definition of "small refinery" in § 80.2 for the year or years for which an exemption is sought. Failure to meet the definition of small refinery for any calendar

year for which an exemption was granted would invalidate the exemption for that calendar year.

(f)    At any time, a refiner with a small refinery exemption under paragraph (a) of this section may waive that exemption upon notification to EPA.

    (1)    A refiner's notice to EPA that it intends to waive its small refinery exemption must be received by November 1 to be effective in the next compliance year.

    (2)    The waiver will be effective beginning on January 1 of the following calendar year, at which point the transportation fuel produced at that refinery will be subject to the renewable fuels standard of § 80.1405 and the owner or operator of the refinery shall be subject to all other requirements that apply to obligated parties under this Subpart M.

    (3)    The waiver notice must be sent to EPA at one of the addresses listed in paragraph (h) of this section.

(g)    A refiner that acquires a refinery from either an approved small refiner (as specified in § 80.1442(a)) or another refiner with an approved small refinery exemption under paragraph (a) of this section shall notify EPA in writing no later than 20 days following the acquisition.

(h)    Verification letters under paragraph (b) of this section, petitions for small refinery hardship extensions under paragraph (e) of this section, and small refinery exemption waiver notices under paragraph (f) of this section shall be sent to the attention of "RFS Program" to the address in § 80.10(a).

**D.    40 C.F.R. § 80.2—Definitions**

* * *

Small refinery means a refinery for which the average aggregate daily crude oil throughput (as determined by dividing the aggregate through-put for the calendar year by the number of days in the calendar year) does not exceed 75,000 barrels.

# Standing Declarations

# UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| ALON REFINING KROTZ SPRINGS, INC.,<br>                    *Petitioner,*<br><br>v.<br><br>U.S. ENVIRONMENTAL PROTECTION<br>AGENCY,<br>                    *Respondent.* | Case No. 25-1187 |

## CORRECTED DECLARATION OF JOSEPH ISRAEL

I, Joseph Israel, declare under penalty of perjury that the following is true and correct to the best of my knowledge:

1.    I am Executive Vice President, President of Refining and Renewables at Delek US Holdings, Inc., the corporate parent of Alon Refining Krotz Springs, Inc. ("Krotz Springs"). In that role, I am responsible for overseeing the performance of all refinery subsidiaries of Delek US Holdings, including Krotz Springs.

2.    In 2023, Krotz Springs exceeded an average daily throughput of 75,000 barrels of crude oil per day. Before 2023, Krotz Springs had never exceeded that threshold for any calendar year.

3.    On May 27, 2025, Krotz Springs petitioned EPA for a small-refinery exemption from its 2024 obligations under the Renewable Fuel Standard. Krotz Springs has already purchased Renewable Identification

Numbers ("RINs") to demonstrate compliance for 2024. Those RINs cost approximately $57 million.

Dated: September 25, 2025

DocuSigned by:

2061CDB65D7244E...

Joseph Israel

2

## UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

HF Sinclair Refining & Marketing
LLC and HF Sinclair Parco Refining
LLC,

              *Petitioners*,

    v.

Environmental Protection Agency,

              *Respondent*.

Case No. 25-1197

## DECLARATION OF MIKE REMY

I, Mike Remy, declare under penalty of perjury that the following is true and correct to the best of my knowledge:

1.    I am Mike Remy, Renewable Fuels Manager at HF Sinclair Corporation, the corporate parent of both HF Sinclair Refining & Marketing LLC and HF Sinclair Parco Refining LLC.  In that role, I am responsible for managing the trading of Renewable Identification Numbers (RINs) for HF Sinclair Refining & Marketing LLC to satisfy Renewable Volume Obligations (RVOs) of all refinery subsidiaries of HF Sinclair Corporation, including HF Sinclair Parco Refining LLC.

ADD-37

2. From 2014 to 2022, HF Sinclair Parco Refining LLC never exceeded an average daily throughput of 75,000 barrels of crude oil per day.

3. In 2025, HF Sinclair Refining & Marketing LLC petitioned for a small refinery exemption for HF Sinclair Parco Refining LLC's 2024 compliance obligations under the Renewable Fuel Standard.

4. After EPA denied that petition, HF Sinclair Refining & Marketing LLC filed a small refinery exemption petition on behalf of HF Sinclair Parco Refining LLC for the 2023 compliance year and explained that the refinery's average aggregate daily crude oil throughput in 2023 was less than 75,000 barrels. That petition remains pending before EPA.

5. HF Sinclair Refining & Marketing LLC is required to satisfy HF Sinclair Parco Refining LLC's RVOs for calendar year 2024 by December 1, 2025. The cost of compliance for Parco's RVOs for calendar year 2024 exceeds $50 million.

Dated: October 7, 2025

*Mike Remy*
_____
Mike Remy